ARTHUR P. SCHWARTZ, TRANSFEREE, THOR PUBLICATIONS, INC., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7087–73—7089–73.     Filed March 6, 1978.

---

[1]Cases of the following petitioners are consolidated herewith: Arthur P. Schwartz, transferee, Alpha Study Aids, Inc., transferor, docket No. 7088–73; Arthur P. Schwartz, docket No. 7089–73.

*Harvey Paul Stein,* for the petitioners.

*Stanley J. Goldberg* and *Ronald E. Friedman,* for the respondent.

TANNENWALD, *Judge:* In these consolidated cases, respondent determined the following deficiencies in Federal income tax and additions to tax:

| Docket No. | | TYE | Income tax | Addition to tax (sec. 6651(a))[2] |
|---|---|---|---|---|
| 7087-73 | Thor Publications, Inc ..... | 9/30/65 | $16,455.93 | – |
| | | 9/30/66 | 38,180.47 | – |
| | | 9/30/68 | 484,924.85 | – |
| 7088-73 | Alpha Study Aids, Inc..... | 10/31/65 | 1,967.94 | – |
| | | 10/31/68 | 49,142.75 | – |
| 7089-73 | Arthur P. Schwartz ........ | 12/31/66 | 1,149.22 | – |
| | | 12/31/67 | 111.54 | – |
| | | 12/31/68 | 313,454.35 | $15,572.72 |

Concessions having been made by the parties, the issues for decision are:

(1) Whether Arthur P. Schwartz received constructive dividends in 1968 from Alpha Study Aids, Inc., Thor Publications, Inc., and Barrister Publishing Co., Inc.;

(2) Whether Arthur P. Schwartz is liable as a transferee for the income tax deficiencies, if any, of Thor Publications, Inc., and Alpha Study Aids, Inc.; and

(3) Whether certain amounts claimed as educational expenses by Arthur P. Schwartz are deductible as ordinary and necessary business expenses.

## FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Arthur P. Schwartz (Schwartz or petitioner) resided in New York, N. Y., at the time the petitions herein were filed. His individual income tax returns for the taxable years 1966, 1967,

---

[2] All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable periods at issue.

and 1968 were filed with the District Director of Internal Revenue, Manhattan District, N. Y.

Alpha Study Aids, Inc. (Alpha), was a corporation organized under the laws of the State of New York, formerly having its principal place of business in New York, N. Y. It has been liquidated and dissolved. Its United States corporation tax returns for the taxable years ending October 31, 1965, 1966, 1967, and 1968 were filed with the District Director of Internal Revenue, Manhattan District, N. Y.

Thor Publications, Inc. (Thor), was a corporation organized under the laws of the State of New York, formerly having its principal place of business in New York, N. Y. It has been liquidated and dissolved. Its United States corporation income tax returns for the taxable years ending September 30, 1965, 1966, 1967, and 1968 were filed with the District Director of Internal Revenue, Manhattan District, N. Y.

In 1960, while a college student, petitioner founded a business to prepare and market study guides for subjects taught at colleges in the New York City area. During the following years, the business grew substantially, and various corporations were organized to produce study guides in related areas. In particular, Thor was established in April 1963 to publish study guides in the area of literature and philosophy, Alpha was organized in July 1964 to publish study guides for high school students in subjects such as trigonometry and American history, and Barrister Publishing Co., Inc. (Barrister), was organized in November 1965 to publish legal study guides. Petitioner was the controlling shareholder and chief executive officer of each of the corporations.

During April 1967, Thor, Alpha, Barrister, Monarch Press Publishing, Inc. (Monarch Press), Monarch Enterprises, Inc., and Monarch Overseas, Ltd., filed separate petitions for an arrangement under chapter XI, Bankruptcy Act.[3]

In their petitions for arrangement, Thor, Alpha, and Barrister each alleged that it was "unable to pay its debts as they mature" and listed total assets and liabilities as follows:

---

[3]The evidence is sparse as to whether the corporations other than Thor and Alpha were ever liquidated and dissolved, but respondent does not argue that they were not and, indeed, in his opening statement appears to concede that they were.

| Corporation | Assets | Liabilities |
|-------------|--------|-------------|
| Thor | $437,287.31 | $235,044.74 |
| Alpha | 45,717.00 | 6,662.09 |
| Barrister | 517,597.54 | [4]590,635.82 |

Included in Thor's assets were inventory valued at $246,555.28 and debts owing from Monarch Press and Monarch Enterprises in the sum of $190,632.03. Excluded from its listed assets were unamortized book plates, listed as having a net value of $159,745.37, and various copyrights, the value of which was not determined. Alpha's listed assets consisted solely of inventory. Included in Barrister's assets were inventory valued at $175,788.08 and book plates valued at $148,238.93.

On the recommendation of their attorneys, the six corporations petitioned the bankruptcy court on May 22, 1967, to consolidate the proceedings in which they were involved. The attorneys suggested this procedure because they believed that it would be easier to administer one consolidated proceeding and that it was more likely that an arrangement could be confirmed if only a single creditors' committee was involved.

The petition for consolidation alleged, inter alia, as follows:

5. Although not the parent of the other debtors, Monarch Press Publishing, Inc. had acted as such in connection with the other debtors in the use of its name and good will, making the capital investment for each, retaining their earnings, lending money to and from them, and guaranteeing their obligations.

6. There is in actuality only one management, Arthur P. Schwartz, who determines the management of Monarch Press Publishing, Inc., and through it operates the others as a division.

7. All overhead is paid by Monarch Press Publishing, Inc. and bookkeeping adjustments indicating the obligations are entered on Monarch's books for these charges.

8. To administer the estates separately would create confusion and difficulties inimical to the interest of the creditor body as a whole and would allow the presentation of intercompany claims.

9. In order that there may be equality of treatment among creditors, it is necessary that the above proceedings be consolidated and intercompany claims eliminated.

Due notice of the petition was given to all creditors but none appeared in opposition thereto.

On June 28, 1967, the referee in bankruptcy issued an order

---

[4]The record does not show similar information for the other three corporations, but it is a reasonable inference that their liabilities exceeded their assets.

consolidating the separate proceedings. The referee made findings of facts identical with the factual allegations contained in the above-mentioned petition. Although the assets and liabilities of the debtor corporations were ordered consolidated, the referee's order provided—"that consolidation shall apply only to these proceedings and shall not be deemed to alter, amend or destroy the separate corporate charters of the corporate debtors."

Petitioner and Simon & Schuster, Inc. (Simon & Schuster), entered into negotiations concerning the sale of the assets of the corporations at or about the time that the petitions for arrangement were filed.[5] The purpose of such a sale was to generate sufficient cash to fund a proposed arrangement with the creditors of the corporations, including an arrangement with petitioner in respect of certain loans which he had guaranteed. The creditors' committee was informed of the possible sale to Simon & Schuster on May 10, 1967. On July 13, 1967, a contract, subject to court approval, was entered into by petitioner and the corporations controlled by him to sell certain assets to Simon & Schuster.

The agreement provided in part:

(1) That the sellers assign the trademark "Monarch" (used alone or in conjunction with any other words) to the purchaser;

(2) That the sellers cause any corporate name which included the term "Monarch" to be changed to a name which did not include such term;

(3) That certain books retained by the sellers pursuant to the agreement of sale involved herein be sold under a name or mark not including the name "Monarch."

The agreement included the following allocation of the purchase price:

(1) Publishing rights, plant costs, copyrights, plates (if any), negatives, and related property interests in 34 high school study guides and 319 literature study guides—$1,100,000.

(2) Publishing rights, plant costs, copyrights, plates (if any), negatives, and related property interests in 65 literature analysis

---

[5]Approximately 1 year prior to the filing of the petitions for arrangement, a representative of Simon & Schuster, Inc., contacted petitioner to determine whether petitioner was interested in selling the assets of his corporations. This conversation lasted approximately 5 minutes. We consider the earlier conversation without significance in respect of our decision herein.

guides already published and 86 additional titles which were under contract—$150,000.

(3) All book racks—$125,000.

(4) Inventory of books—$247,500.

(5) The trademark "Monarch," the goodwill associated therewith, and various covenants and agreements, including the agreement not to compete—$50,000.

The purchase price of $1,672,500 was allocated in the books and records of the selling corporations as follows:

| Corporation | Allocation of sales proceeds |
| --- | --- |
| Thor | $1,196,748.80 |
| Alpha | 150,751.20 |
| Barrister | 200,000.00 |
| Monarch Press | 125,000.00 |
| | 1,672,500.00 |

On January 20, 1968, an order was signed confirming the arrangement under chapter XI. Pursuant to this arrangement, $212,414.96 in obligations to creditors of the corporations which had been personally guaranteed by petitioner were satisfied. In addition to the amounts they were to receive as general creditors (i.e., 50 percent of their claims), some of the creditors, whose claims were guaranteed by petitioner, were to be paid an additional 20 percent of their claims in eight equal quarterly payments commencing 15 months after confirmation of the arrangement. Payment of these amounts was guaranteed by petitioner.

The arrangement further provided that Simon & Schuster would lend the debtor corporations up to $100,000 which would be paid to the unsecured creditors. This loan would be secured by an assignment by the debtors of all of their accounts receivable and inventory and would be further secured by the payments (up to a maximum of $15,000 annually) petitioner was to receive under an employment contract which he contemporaneously entered into with Simon & Schuster.

On January 18, 1968, Alpha and Thor, by their boards of directors, adopted plans for complete liquidation and dissolution during the succeeding 12-month period. By February 8, 1968, the agreement between petitioner and the corporations he controlled and Simon & Schuster had been consummated. Petitioner

received $7,466.06 and $1,355.91 in liquidation of Thor and Alpha, respectively, and he reported such amounts on his 1969 tax return. Respondent determined that petitioner received liquidating dividends from Alpha and Thor, as well as amounts constructively received from Barrister, in the amount of $1,152,348.12, on which he should be taxed directly and also as a transferee with respect to the tax liabilities of Alpha and Thor.[6]

Petitioner received a bachelor of arts degree from Columbia University in 1964. He continued his studies through graduate work thereafter.

During the years 1966, 1967, and 1968, petitioner paid $1,289, $1,277.86, and $1,807, respectively, to New York University and Columbia University and for books, supplies, and travel. These expenses were incurred in connection with petitioner's enrollment in graduate school courses as part of a degree program conducted by the New York University School of Education. The courses taken during 1966, 1967, and 1968 were advanced-level courses in the areas of social studies, education, and the humanities. Petitioner hoped that, as a result of receiving graduate degrees in education, he would receive added stature and recognition in his role of president of corporations which published educational study guides and that, as a result of attending the courses, he would acquire greater understanding of the subjects. Petitioner claimed the amounts so expended as deductible education expenses on his income tax returns for the years 1966, 1967, and 1968. Respondent disallowed the claimed deductions.

## OPINION

### 1. *Constructive Dividends*

The principal issue in this case involves respondent's assertion of a constructive dividend against petitioner on the ground that the proceeds of the sale of the assets of three corporations owned and controlled by him were used to pay off the liabilities of other corporations, also owned and controlled by petitioner and whose assets were likewise sold. Some of those liabilities were personally guaranteed by petitioner. The entire transaction,

---

[6]Respondent has abandoned his original claim that sec. 337 did not apply to the liquidations of Alpha and Thor and that they therefore realized taxable income from the sale of their assets to Simon & Schuster.

including the sale of the corporate assets, was accomplished as part and parcel of an arrangement between all the corporations and their creditors carried out under the aegis of a court order in a consolidated proceeding for an arrangement under chapter XI of the Bankruptcy Act.

Essentially, respondent seeks to have us construct a test that would treat any intercorporate transfer between brother-sister corporations (except with respect to bona fide loans) as a constructive dividend to the common shareholder unless the transfer was motivated by a business purpose of sufficient degree that a loss resulting therefrom would give rise to an ordinary deduction under the doctrine of *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46 (1955). Under respondent's theory, the presence or absence of a benefit to the shareholder becomes relevant only where such a high level of business purpose is first found to exist. We decline respondent's invitation to promulgate such a test. We think that there are several strands with which the ultimate fact pattern of a contructive dividend is woven—business purpose, intent, and benefit to the shareholder. See *Kuper v. Commissioner*, 533 F.2d 152 (5th Cir. 1976), affg. in part and revg. in part 61 T.C. 624 (1974). In our opinion, the area is one which does not lend itself to any precise standard. Cf. *Commissioner v. Duberstein*, 363 U.S. 278 (1960).

It is well established that transfers between related corporations can result in constructive dividends to their common shareholders. *Joseph Lupowitz Sons, Inc. v. Commissioner*, 497 F.2d 862 (3d Cir. 1974), affg. on this issue T.C. Memo. 1972-238; *Rapid Electric Co. v. Commissioner*, 61 T.C. 232 (1973). However, common ownership alone is not sufficient to justify treating intercorporate transfers as constructive dividends; the expenditures must be for the shareholder's personal benefit, and such benefit must be more than incidental. *Rapid Electric Co. v. Commissioner*, *supra* at 240; *Ross Glove Co. v. Commissioner*, 60 T.C. 569, 595 (1973); *Rushing v. Commissioner*, 52 T.C. 888, 894 (1969), affd. on other issues 441 F.2d 593 (5th Cir. 1971). Payments made by one corporation to satisfy a debt of another corporation personally guaranteed by a shareholder of the former can, under certain circumstances, be a sufficient benefit to the shareholder if the debtor corporation would otherwise default on its obligation. *Wortham Machinery Co. v. United*

*States,* 521 F.2d 160, 164 (10th Cir. 1975); *Cox v. Commissioner,* 56 T.C. 1270 1280 (1971). But, as has been observed (see *Sammons v. Commissioner,* 472 F.2d 449, 452 (5th Cir. 1972), revg. T.C. Memo. 1971–145)—

"(t)he line between shareholder benefit and corporate benefit is not always clear * * * because some expenditures embody both elements; and an indirect [or an incidental] benefit to the shareholder should not by itself be treated as a distribution to him." B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 7.05, at 7–27 (3d ed. 1972) (bracketed words added).

The critical circumstance herein is the existence of the chapter XI proceeding, including the impact of the order of consolidation. Respondent takes the position that such proceeding was simply a convenient instrument to facilitate the sale of the assets of the various corporations and the use of the proceeds of the sale for the benefit of petitioner. We think that respondent views the situation from the wrong end of the telescope and ignores the philosophy which permeates the attitude of the courts in issuing consolidation orders in such proceedings.

In cases involving brother-sister corporations, consolidation is appropriate where the affairs of the separate entities "are so intermingled that the court cannot separate their assets and liabilities." Advisory Committee's note to Rule 117, Bankruptcy Rules; *In re Continental Vending Machine Corp.,* 517 F.2d 997 (2d Cir. 1975). As a result of consolidation, the assets and liabilities of the separate entities are put together, all interentity debits and credits are eliminated, and claims against the separate entities are treated as claims against all of the assets. *Chemical Bank New York Trust Co. v. Kheel,* 369 F.2d 845 (2d Cir. 1966); 12 Collier, Bankruptcy, par. 117.03 (14th ed. 1976). Because the substantive rights of the creditors of the separate entities are altered, the power to consolidate is used "sparingly" to prevent unfair treatment of creditors who dealt with one corporation as a separate entity rather than as a member of any operating group. *In re Continental Vending Machine Corp., supra* at 1001; *In re Flora Mir Candy Corp.,* 432 F.2d 1060, 1062–1063 (2d Cir. 1970); *Chemical Bank New York Trust Co. v. Kheel, supra* at 847. "[C]onsolidation * * * is no mere instrument of procedural convenience." *In re Flora Mir Candy Corp., supra* at 1062.

In the instant case, the petitioning corporations alleged, and

the referee in bankruptcy found, that the separate corporations were in fact run by a single management and that to administer the estates separately would be inimical to the interest of the creditor body as a whole. Consolidation of the proceedings was initially suggested by petitioner's attorneys in the hope that an arrangement with creditors could be successfully negotiated. But confirmation of the application for consolidation was approved by the referee in bankruptcy only after notice was given to the creditors and no objections were interposed. Under these circumstances, we think the fact that the corporations rather than the creditors filed the application is of minimal significance. Compare *Stone v. Eacho*, 127 F.2d 284 (4th Cir. 1942), where the debtor corporation made the application to consolidate, and *In re Flora Mir Candy Corp.*, *supra*, where the creditors successfully opposed consolidation.

By virtue of the consolidation, the sale of the assets of the corporations to Simon & Schuster was facilitated and the entire body of creditors benefited thereby. Indeed, separate negotiations by each corporation on its own behalf and on behalf of its creditors would have so fragmented the situation that Simon & Schuster could well have succeeded in obtaining a more favorable price or more favorable terms to the disadvantage of the creditors, or produced a different allocation of the purchase price, with the result that a greater proportion of the proceeds of the sale would have inured to the benefit of the insolvent corporations and their creditors.[7] Nor should we ignore the fact that, had he wished to structure the sales for his benefit, petitioner could have kept each corporate entity separate and, pursuant to section 337, caused the assets of Thor, Alpha, and Barrister to be sold and caused these corporations to be liquidated. He then could have paid off his liabilities as a guarantor from the funds so received and had a considerable sum left over. This process would have left the creditors of the insolvent corporations with recourse only to the assets of those corporations.

In short, as we view the circumstances herein, the sale of the corporate assets was an instrument of the chapter XI arrange-

---

[7]Although the agreement allocated only $50,000 of the purchase price to the trademark and goodwill associated with the name "Monarch," had the bankruptcy proceedings not been consolidated, the creditors of Monarch Press might have refused to participate in the sale unless that corporation received more for its assets.

ment and not vice versa, as respondent contends. As a consequence, we are satisfied that the use of excess assets of some of the corporations to satisfy the excess liabilities of other insolvent corporations was bottomed on substantial business considerations with any resulting benefit to petitioner merely incidental thereto. In this context, the provisions of the consolidation order preserving the separate legal identity of each of the corporations should be viewed as simply a device for preserving the rights of the creditors of each corporation in the event that the business objectives of the consolidation and the accompanying sale of the corporate assets did not come to fruition. Such provision should not be accorded such a degree of independent significance as to justify the position advocated by respondent.

Nor are we convinced that a different conclusion should obtain because some of the proceeds of the sale were used to pay creditors whose claims, in the aggregate amount of $212,414.96,[8] had been personally guaranteed by petitioner. In the first place, those creditors were in any event entitled to have 50 percent of their claims satisfied under the arrangement, as were those general creditors whose claims were not so guaranteed. Our conclusion that the use of the proceeds of sale to satisfy the claims of the latter category of creditors was sufficiently permeated with a business purpose to avoid the constructive dividend taint to that extent disposes of the issue of benefit to petitioner. Compare *Commissioner v. Makransky*, 321 F.2d 598, 601–602 (3d Cir. 1963), affg. 36 T.C. 446 (1961), and *Sachs v. Commissioner*, 32 T.C. 815, 821–822 (1959), affd. 277 F.2d 879 (8th Cir. 1960), with *Ruben v. Commissioner*, 97 F.2d 926 (8th Cir. 1938), revg. 36 B.T.A. 604 (1937). Moreover, even if there were a constructive dividend (which in this case respondent treats as capital gain to the petitioner, except for a small amount claimed to have been constructively received from Barrister), petitioner might well be entitled to an offsetting bad debt deduction under section 166. Cf. *Putnam v. Commissioner*, 352 U.S. 82 (1956).

Thus, it would appear that the maximum amount of benefit with which petitioner might be charged would be represented by

---

[8] The parties have stipulated that $212,414.96 in personal guarantees made by petitioner were satisfied pursuant to the arrangement. The order directing distribution indicated that claims totaling $190,568.35 were made by creditors whose claims were guaranteed by petitioner. Because we do not believe that this discrepancy affects the result we reach herein, we do not resolve it.

the other half of the guaranteed claims, or $106,207.48. But as to two-fifths of that 50 percent (or 20 percent of the total claims), petitioner remained personally liable as a guarantor. With respect to the balance, petitioner furnished additional consideration, since, under the arrangement, Simon & Schuster was obligated to loan up to $100,000 to facilitate the consummation of the arrangement and any such loan was required to be guaranteed by petitioner to the extent of sums due petitioner under his employment agreement with Simon & Schuster. To be sure, the amount ultimately loaned by Simon & Schuster seems to have been only $22,000, but the fact remains that petitioner's potential exposure at the time the arrangement was confirmed by the referee in bankruptcy was for the full $100,000.[9]

The long and the short of the instant case is that respondent has missed "the larger forest while too narrowly focusing on the component trees" and has sought to have us label petitioner as one of a class of "clever tinkerers of the code who by exalting form over substance subvert the purposes inherent in our revenue statutes." See *Kuper v. Commissioner, supra* at 163. This we are not prepared to do. The cases relied upon by respondent are distinguishable on their facts. *Sammons v. Commissioner, supra; Sparks Nugget, Inc. v. Commissioner,* T.C. Memo. 1970–74, affd. 458 F.2d 631 (9th Cir. 1972); and *Aylsworth v. Commissioner,* T.C. Memo. 1963–221, stand for the proposition that where a transfer is made primarily for the benefit of a shareholder, there is a constructive dividend. In *Knipe v. Commissioner,* T.C. Memo. 1965–131, affd. per curiam sub nom. *Equitable Publishing Co. v. Commissioner,* 356 F.2d 514 (3d Cir. 1966), the court was unable to find that the transferor corporation received any benefit as a result of the transfer, i.e., that the transfer had a business purpose.

While the record herein does not contain the degree of preciseness which we would have preferred to see, we are satisfied that, on the whole, it justifies our conclusion that

---

[9] According to the order directing distribution issued by the referee in bankruptcy, at least one claim guaranteed by petitioner, to wit, $12,875 against Thor, appears not to have been filed against Monarch Press or the consolidated group. Since Thor had an excess of assets over liabilities, the payment of this claim should not be considered as benefiting petitioner. We also note that, to the extent that the debtor corporations would have had funds available to pay their guaranteed creditors if there had been no consolidation, any benefit received by petitioner would be further reduced. However, there is no evidence indicating the extent to which such funds were, in fact, available for such purpose.

petitioner did not realize any income by way of constructive dividends. His liability as transferee of Thor and Alpha is therefore limited to the amounts of $7,466.06 and $1,355.91, respectively, which he received in liquidation of those corporations.[10]

## 2. *Educational Expenses*

During the years 1966, 1967, and 1968, petitioner incurred educational expenses which were claimed as deductions in his income tax returns for each year. Respondent argues that such amounts are not deductible because petitioner has failed to establish that the course work maintained or improved skills required of him as a publisher. Sec. 1.162–5(a)(1), Income Tax Regs.[11]

Whether education maintains or improves skills required by the taxpayer in his trade or business is a question of fact. *Baker v. Commissioner*, 51 T.C. 243, 247 (1968). The burden of proof is on petitioner. Rule 142, Tax Court Rules of Practice and Procedure.

Petitioner's graduate work continued without interruption after he obtained his B.A. degree in 1964. Admittedly, petitioner was the key officer and employee of corporations engaged in the business of publishing educational materials in the form of study guides covering high school and college level courses, individual works of literature, and the works of individual poets and philosophers. There was no doubt some relationship between the subject matter of the courses petitioner took at New York University and Columbia University and his trade or business as a publisher. While we recognize that a precise correlation is not necessary, we cannot say, on the basis of the record before us, that petitioner has sustained his burden of proof to justify our concluding that there was a sufficient nexus between the educational expenditures and petitioner's trade or business. Cf.

---

[10]Petitioners have offered no evidence as to any of the items involved in the deficiencies asserted against Thor and Alpha and they are accordingly deemed abandoned. As to the taxability of those corporations on the gain from the sale of their assets to Simon & Schuster, see n. 6 *supra*.

[11]Respondent does not contend that the educational expenses involved herein were made by petitioner to satisfy the minimum educational requirements for qualification in his employment (sec. 1.162–5(b)(2), Income Tax Regs.) or that they would qualify him for a new trade or business (sec. 1.162–5(b)(3), Income Tax Regs.). See *Carlucci v. Commissioner*, 37 T.C. 695 (1962).

*Carroll v. Commissioner,* 51 T.C. 213 (1968), affd. 418 F.2d 91 (7th Cir. 1969).[12] Accordingly, as to this issue, respondent's determination is sustained.

*Decisions will be entered under Rule 155.*

---

[12]Compare *Glasgow v. Commissioner,* T.C. Memo. 1972–77, where a direct correlation of courses to work was shown. With respect to the other issues raised by the deficiency notice issued to petitioners individually (other than the item of constructive dividends), petitioner has offered no evidence and we deem that he has abandoned them.