JOHN R. KORSMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Korsman v. Commissioner
Docket No. 483-84.
United States Tax Court
T.C. Memo 1986-270; 1986 Tax Ct. Memo LEXIS 340; 51 T.C.M. (CCH) 1332; T.C.M. (RIA) 86270; July 2, 1986. Alfred J. O'Donovan, III, for the petitioner. Anthony A Falzone, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioner's Federal income tax liability as follows: Taxable
Year
Deficiency
1979
$12,420.41
1980
8,569.08
1981
8,137.48
After concessions by the parties, the remaining issue is whether petitioner, a commercial airline pilot, is entitled to deduct operating costs and depreciation incurred due to his ownership of a private airplane as deductible educational expenses under section 162. [1] We must also decide whether petitioner is entitled to claim an investment tax credit with respect to this airplane. *342 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the attached exhibits are incorporated by this reference. John R. Korsman (petitioner) filed his Federal income tax returns for the taxable years 1979, 1980, and 1981 with the Internal Revenue Service Center at Andover, Massachusetts. At the time he filed his petition in this case petitioner resided in Mason, New Hampshire. Petitioner is a veteran commercial pilot for Delta Airlines (Delta) flying out of Logan International Airport in Boston, Massachusetts. He was first employed in the airline industry in 1954 when he was hired as a mechanic with Northeast Airlines (Northeast). Subsequently, he was trained as a flight engineer. Later, when Northeast implemented a requirement that all of its flight engineers be licensed pilots, it provided training to petitioner so that he could become a licensed commercial pilot.After receiving his pilot's license he was promoted by Northeast to the position of co-pilot and served as a member of the flight crew on different types of aircraft. In 1967, he received his first assignment as a captain of a passenger airplane. Later, petitioner began flying *343 the Boeing 727, which is powered by three jet engines and has the capacity to carry approximately 137 passengers. He continued to serve as captain of Boeing 727 aircraft after the merger of Northeast into Delta in 1972. During the years in issue, petitioner flew as captain for Delta approximately 75 hours per month. Petitioner did not always fly on a regular schedule. At times during his career petitioner flew "reserve," meaning he was required to be available to fly on very short notice in the event the pilot scheduled to fly a route was unable to do so because of illness or otherwise. Delta provided petitioner all of the training required by the Federal Aviation Administration (FAA) to maintain his proficiency as captain of a commercial jet. This training included semi-annual testing on flight simulators, which recreate actual flight conditions in a mock-up of an airplane cockpit. Before petitioner could fly a airplane on a route over which he had not flown as a commercial pilot, Delta was required by the FAA to educate petitioner regarding any special characteristics of the route. For safety reasons, it is important that a commercial pilot be familiar with the layout, surrounding *344 terrain, the traffic control procedures, and the particular requirements for an approach under instrument flying rules (IFR). The FAA regulations in effect prior to August 31, 1980, required that each airline qualify its pilots before they fly a route by making a qualifying entry into any new airport as follows: The qualifying pilot shall make an entry as a member of a flight crew at each regular, provisional, and refueling airport into which he is scheduled to fly. The entry must include a landing and a takeoff. The qualifying pilot must occupy a seat in the pilot compartment and must be accompanied by a pilot who is qualified for the airport. A pilot did not need to make a qualifying entry into a new airport if the airline familiarized the pilot with approved pictorial means. On May 11, 1978, the FAA announced proposed changes to its regulations regarding the qualification of pilots for new routes. The proposed regulations, which became effective as final regulations on August 31, 1980, generally eliminated the requirement that each pilot make a physical entry into each airport for which he was to be qualified. Delta was still required to familiarize a pilot with the characteristics *345 of any route before the pilot was called upon to carry passengers over the route. However, a physical qualifying entry or qualification by pictorial means was still required where entry into the airport was unusual due to surrounding terrain or obstructions, or complex approach or departure procedures. Delta regularly used flight simulators to qualify its pilots to land at new airports. On August 31, 1979, petitioner purchased a Cessna 185 II Skywagon airplane for $54,500 plus shipping costs of $440 from Fitchburg Colonial Aviation, Inc., in Fitchburg, Massachusetts. The Cessna 185 II Skywagon (Cessna 185) is a single-engine, propeller driven airplane, which seats from one to six persons. The Cessna 185 was equipped with much of the same basic instrumentation as the Boeing 727's petitioner flew in his employment with Delta, including the equipment for navigation under IFR. The Cessna 185 was delivered to petitioner at the Fitchburg, Massachusetts airport, which is near his home in Mason, New Hampshire. Shortly thereafter, he made several short flights in the plane accompanied by a trained flight instructor. These flights were necessary in order for petitioner to be "checked-out" *346 in the operation of the airplane to satisfy the requirements of the company insuring the plane. Petitioner flew the airplane locally 16 times from September 3, 1979, to January 16, 1980, often landing at small airports in the vicinity, but always returning to Fitchburg the same day. On January 21, 1980, petitioner began the first of three cross-country trips in the Cessna 185. Petitioner was accompanied by his son, a licensed pilot who owned his own small airplane. The trip began from Fitchburg and terminated on January 25, 1980, at San Martin, California. Petitioner's son lived nearby with his mother and step-father. Petitioner and his son made several stops along the way as follows: Frederick, Maryland, Louisville, Kentucky, Tulsa, Oklahoma, Lubbock, Texas, El Paso, Texas, Blythe, California, San Jose, California, and San Martin, California. After spending a short time in California during which he visited his daughter, petitioner returned home via a commercial airliner. Petitioner did not fly the Cessna 185 again until July 1980. In the interim, petitioner's son flew the airplane frequently for purely personal reasons. During this time the airplane was parked at South *347 County Airport in San Martin, California. On July 10, 1980, petitioner's son flew the Cessna 185 from San Martin to San Jose where he met petitioner. From San Jose petitioner and his son began a 3-day cross country trip to Fitchburg stopping along the way at Salt Lake City, Utah, Cheyenne, Wyoming, Des Moines, Iowa, and South Bend, Indiana. During the next month, petitioner made several flights in the general vicinity of Fitchburg. During these trips petitioner would typically land at one or more small airports before returning to Fitchburg. Trips from Fitchburg to Manchester, New Hampshire, on July 18 and August 4, 1980, were for the purpose of having repairs made to the equipment of the Cessna 185. Then, on August 23, 1980, petitioner and his son set out again for California in the Cessna 185 making stops at South Bend, Des Moines, Cheyenne, and Salt Lake City. Shortly after this trip, petitioner returned home again, leaving the Cessna 185 with his son. During the next 10 months, petitioner's son was the only person to fly the Cessna 185. He flew the airplane several times for his personal enjoyment. Petitioner did not fly the airplane again until June 11, 1981, when *348 he flew from San Martin to Reno, Nevada, for 3 days. With the exception of one 3-day trip in the Cessna 185 by petitioner and his son to Las Vegas, Nevada, petitioner's son continued to be the only person to use the plane until he ferried the airplane back to Fitchburg in October 1981. For the last three months of the taxable year 1981, petitioner only flew the Cessna locally, landing at various small airports. Many of the airports into which petitioner flew the Cessna 185 were in cities into which Delta flew regularly scheduled flights. However, other airports flown into by petitioner in the Cessna 185 were physically incapable of accomodating any of Delta's passenger jet fleet due to factors such as runway length. Others were simply not served by Delta at the time. The following tables list all the cities to which petitioner flew to in the Cessna 185, whether Delta provided service to that airport during the taxable years in question, and whether one or more of the jet airplanes in Delta's fleet could make a regular non-emergency landing at these airports: Airports Flown to by Petitioner in Cessna 185 at which Delta Fleet could not land
Fitchburg, MA Gardner, MA *349 Nashua, NH Keene, NH
Pepperell, MA Frederick, MD
Tewksbury, MA
San Martin, CA
Airports Flown to by Petitioner in Cessna 185 that were capable of being served by Delta
Delta
Airport
Service
Worchester, MA
No Sterling, MA
No Manchester, NH
No Louisville, KY
No Tulsa, OK
Yes
Lubbock, TX
No El Paso, TX
No Blythe, CA
No San Jose, CA
No Salt Lake City, UT
Yes
Cheyenne, WY
No Des Moines, IW
No South Bend, IN
No Windsor Locks, CT
No Reno, NV
Yes
Las Vegas, NV
Yes
Petitioner was unfamiliar with the approaches and landings required at most of the airports visited on his cross country trips with his son. He had, however, previously landed commercial planes at Manchester, Windsor Locks, and Louisville. After enactment of the Airline Deregulation Act of 1978, many airlines expanded service into new cities while terminating less profitable routes. Delta made schedule changes after the taxable years in issue attributable in part of the deregulation of the commercial aviation industry. With regard to the cities into which petitioner flew in the Cessna 185, Delta ceased serving Reno, but initiated service *350 to El Paso, Lubbock, and Louisville. Delta previously served Worchester, Massachusetts, and Manchester, but ceased flying to those cities prior to the years in issue. None of petitioner's landings and takeoffs in the Cessna 185 constituted qualifying entries for the purposes of the pilot qualification required under FAA regulations. Further, the purchase and operation of the Cessna 185 by petitioner were not necessary to meet requirements of Delta or the requirements of applicable law or regulations imposed as a condition to the retention by petitioner of his employment or to his rate of compensation. Petitioner could have conducted his independent familiarization plan by means other than by purchasing and flying a private plane such as the Cessna 185. First, he could have familiarized himself with airports serviced by Delta via employer provided training consisting of actual physical entries into these airports or flight simulation. Second, petitioner could have observed approaches, landings, and takeoffs from the extra seat in the cockpit available to Delta personnel known as the "jumpseat." Although Delta restricted the availability of this seat for its off-duty pilots, and *351 other persons including FAA personnel had priority in its use, petitioner attempted unsuccessfully to ride in the cockpit "jumpseat" on no more than two or three occasions. Lastly, petitioner could have rented an airplane rather than purchasing his own plane. On his Federal income tax return for the taxable year 1979 petitioner claimed employee business expenses including costs of operating the Cessna 185 totaling $11,728.47. In his statutory notice of deficiency the Commissioner disallowed the expenses claimed by petitioner with regard to the Cessna 185 for the taxable year 1979 as follows: 1979
Fuel and additives
$ 511.22
Insurance
1,140.00
Inspection
92.09
Registrations
15.00
Manuals
146.43
Repairs
146.43
Windshield cover
49.95
Parts
18.95
Rent
90.00
Shipping
440.00
Depreciation
8,175.39
Interest
903.01
$11,728.47
The Commissioner also disallowed the investment tax credit in the amount of $5,722.77 claimed by petitioner in connection with the purchase of the Cessna 185. Similarly, for the taxable years 1980 and 1981 the Commissioner disallowed the employee business deductions claimed in connection with the operation of the Cessna *352 185 as follows: 1980
Fuel
$ 2,468.16 Insurance
1,225.00 Tie Downs
383.00 Inspections
742.53 Depreciation
8,216.39 Interest
1,457.83 $14,492.91 1981
Fuel
$ 763.50 Insurance
1,567.00 Tie Downs
405.00 Inspections
617.40 Property Tax
564.74 Professional dues
944.87 Repairs
342.11 Depreciation
8,257.39 FAA Medical
85.00 Interest
106.78 Mathematical error
(84.15)
$13,569.64 The Commissioner allowed petitioner an itemized deduction for the taxable years in issue for all of the interest expense for which an employee business expense deduction was denied. The Commissioner disallowed an investment tax credit of $8 claimed by petitioner in 1980 in connection with the purchase of equipment for the Cessna 185. Petitioner concedes that the amount claimed as a deduction for "shipping" is properly added to the tax basis of the airplane. OPINION After concessions by the parties, the issues before us concern the deductibility of expenses of operation, including depreciation, and the availability of investment tax credit arising out of the purchase and operation of petitioner's airplane. Petitioner *353 claims that he purchased the airplane to familiarize himself with airports currently served by Delta or to which Delta might expand service and to which he might be called upon to fly. Therefore, petitioner contends that the expenses of operating the plans are deductible under section 162 because those expenses constitute deductible education expenses. Similarly, petitioner contends that he is entitled to claim depreciation deductions and an investment tax credit with respect to the airplane because by undertaking his alleged familiarization program he was using the airplane in his trade or business. Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business." Education expenses are deductible only if the requirements of section 162 and section 1.162-5, Income Tax Regs., are met. Otherwise expenditures made for education are nondeductible personal expenses. Sec. 1.262-1(b)(9), Income Tax Regs.
Even if we assume that the expenses of operating the Cessna *354 185 are "ordinary and necessary" within the meaning of section 162, educational expenses are deductible only if the education. (1) Maintains or improves skills required by the individual in his employment or other trade or business, or (2) Meets the express requirements of the individual's employer, or the requirements of applicable law or regulations, imposed as a condition to the retention by the individual of an established employment relationship, status, or rate of compensation. [Sec. 1.162-5(a), Income Tax Regs.] Inasmuch as neither Delta nor the FAA required petitioner to conduct his independent airport familiarization program, petitioner's claimed deductions for the operating expenses for the Cessna 185 are deductible only if the familiarization program maintained or improved skills actually required in his employment with Delta. Whether education maintains or improves skills required in the taxpayer's employment is a question of fact. Boser v. Commissioner,77 T.C. 1124, 1131 (1981), *355 revised 79 T.C. II, affd. by unpublished order (9th Cir. 1983); Baker v. Commissioner,51 T.C. 243, 247 (1968). The burden of proof is on the taxpayer. Welch v. Helvering,290 U.S. 111 (1933); Wassenaar v. Commissioner,72 T.C. 1195, 1199 (1979); Rule 142(a). The fact that petitioner's education is in some way helpful to him in the performance of his duties as an employee does not establish that its cost is deductible as a business expense. Carroll v. Commissioner,51 T.C. 213, 215 (1968), affd. 418 F.2d 91 (7th Cir. 1969). Petitioner must show that there was a direct and proximate relationship between his airport familiarization program and the skills required in his employment as a pilot for Delta. Kornhauser v. United States,276 U.S. 145, 153 (1928); Boser v. Commissioner,supra.A precise correlation between the education and the skills required in petitioner's employment is not necessary. Boser v. Commissioner,supra;Schwartz v. Commissioner,69 T.C. 877, 889 (1978). After our review of the record in this *356 case, we are not satisfied that petitioner has demonstrated a direct and proximate relationship between his airport familiarization program and skills actually required of him in the performance of his duties as a pilot for Delta. For this reason, all of the costs of operating the Cessna 185 during the years in issue represent nondeductible personal expenses. Sec. 262. Petitioner is a long time flying enthusiast. He is also an experienced professional pilot. He does not contend that operation of the Cessna 185 improved his basic skills as a commercial pilot, including landings and takeoffs under IFR. He has served as pilot in command of commercial aircraft since 1967 and he regularly flew close to 75 hours per month as a Delta pilot during the taxable years in issue. This case, therefore, is distinguishable from the situation where a pilot is unable to maintain or improve necessary flying skills in the course of his employment. See Boser v. Commissioner,supra.Nor does petitioner contend that the purchase of the Cessna 185 was necessary to practice approaches, landings, and takeoffs at airports about which he was already knowledgeable and to which he *357 previously flew as a Delta or Northeast pilot. Petitioner merely contends that he purchased the Cessna 185 in order to familiarize himself with specific flying conditions in and around cities to which Delta presently flew or where Delta might expand service and to which he might be called upon to fly in the future. This argument relies wholly upon the uncorroborated speculation of petitioner and does not meet his burden of proof. Petitioner had no demonstrable basis for concluding that Delta would expand to some of the cities he visited on his cross-country trips. He presented no documentary evidence or testimony to corroborate his vague speculation about future expansion by Delta in light of the deregulation of the airline industry. Furthermore, even assuming expansion by Delta into new markets, petitioner did not demonstrate any likelihood that he would be called upon to fly to airports outside the Northeast section of the country with which he was not familiar. At the time he incurred the expenses at issue, familiarity with the characteristics of the approaches, landings, and takeoffs at airports to which he could not expect to be called upon to fly was simply not a skill *358 required in his employment. Ultimately, petitioner did pilot Delta passenger aircraft to some of the cities he visited on his familiarization tours, but his unsupported speculation about his future duties as a Delta employee cannot convert what are essentially personal expenses incurred in the course of cross-country and local air travel, as well as the purely personal use of the airplane by his son, into deductible business expenses. We do not doubt that a physical entry into an airport with which he was unfamiliar would be helpful in the event he was later required to pilot a commercial airplane to that location. The fact that the FAA no longer requires physical entries into airports, standing alone, does not prevent us from finding that petitioner's familiarization program maintained or improved skills required in his employment. However, we do not ignore the fact that Delta could not call upon him to fly to a new city without first assuring that petitioner was cognizant of any special characteristics of the route under their qualification program, regardless of petitioner's independent efforts. In this regard, we give no credence to petitioner's self-serving suggestion that *359 he decided to go beyond the training required of him by Delta and the FAA because he is more conscious of the safety of his passengers than his fellow professional pilots. We simply find that, absent a reasonable expectation that he would be called upon to fly to cities visited by him in the Cessna 185 in the course of his employment, petitioner's efforts to familiarize himself with the various airports were not directly and proximately related to his employment. We point out again that our finding on this issue is a factual one. Happily for petitioner, his avocation and his vocation merge to some degree. Such a merger of hobby and occupation can create difficulty in separating personal nondeductible expenses incurred in an activity from those that are deductible. In this case petitioner has not borne the burden placed upon him to prove his entitlement to any deduction. Because we find that the operation the Cessna 185 was not directly and proximately related to petitioner's employment and, therefore, that it did not maintain or improve skills required in his employment, we need not address *360 respondent's alternative arguments that the expenses were not ordinary or necessary or that petitioner failed to substantiate those expenses. Our conclusions regarding the operating expenses also resolve the questions concerning the availability of the depreciation deductions and investment tax credit claimed by petitioner. Based upon our conclusion that petitioner's cross-country and local flights were personal and not made as part of his trade or business, it follows that the Cessna 185 was not property used in the trade or business within the meaning of section 167(a)(1). Therefore, the airplane is not property subject to depreciation. Furthermore, because of the requirement of section 48(a)(1) that "section 38" property must be subject to depreciation, no investment credit is allowable with respect to the Cessna 185. Sec. 38(a). Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue, and all rule references are to this Court's Rules of Practice and Procedure.↩