MAXIMILLIAN SCHNALLINGER AND DOROTHY SCHNALLINGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schnallinger v. Commissioner
Docket No. 9522-84.
United States Tax Court
T.C. Memo 1987-9; 1987 Tax Ct. Memo LEXIS 9; 52 T.C.M. (CCH) 1311; T.C.M. (RIA) 87009; January 6, 1987. *9 Restaurant corporation A advanced to newly formed restaurant corporation B a total of $119,746 in 1976 in order to obtain expanded kitchen space and engage in other cost sharing. Said advances and accrued interest were consistently treated as loans on the books of both corporations. Due to unforeseen financial difficulties, the advances were not repaid. Held, the advances constituted a bona fide loan to corporation B and not a constructive dividend to petitioner-husband, the sole shareholder of both corporations. Robert G. Brazier, for the petitioners. Charles *10 P. Hanfman, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: By notice of deficiency dated January 13, 1984, respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
1975
$11,656
1976
64,510
1977
1,395
1978
224
1979
6,244
After concessions by both parties, [1] the issue remaining for our consideration is whether the $119,746 that Mimi's Atlanta, Inc. advanced Max's Restaurant, Inc. in 1976 constituted equity or debt. If we find that such advance was not a bona fide loan, we must further decide whether that same amount constituted a constructive dividend to petitioner Maximillian Schnallinger. *11 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners timely filed their joint Federal income tax return for the taxable year 1976 with the Internal Revenue Service Center in Chamblee, Georgia on September 15, 1977. At the time of the filing of the petition herein, petitioners were residents of Atlanta, Georgia. [2]
Petitioner has had many years of extensive experience in the designing, opening and managing of hotels and restaurants, both in Europe and in the United States. He attended a hotel trade school in Salzburg, Austrai and then joined Hilton International in a management training program. While employed by Hilton International, petitioner was involved in the opening of hotels and restaurants in Hong Kong and Montreal and developed 19 different restaurant concepts for the 1964 World's Fair. *12 Subsequently, he was employed as the director of food and beverage for Westin Hotels, and from approximately 1970 to 1974, was the general manager of the Fairmont Hotel in Dallas. International City Corporation (ICC) was the manager of the Omni International, a hotel, restaurant and entertainment complex under development in the mid-1970's in downtown Atlanta. The Omni complex was being developed as an indoor Disneyland, a multifunction "destination place" containing a hotel, entertainment facilities, shops, and approximately 20 restaurants. The planned major attractions were the Atlanta Flames hockey team and the "World of Sid and Marty Krofft," a multi-story amusement park which was expected to bring one million people a year into the Omni complex. Because of his experience in developing interrelating restaurants, petitioner was hired in 1974 to develop a food and beverage master plan for the complex and to solicit restauranteurs from other parts of the country to come to the Omni. As part of the incentive offered by ICC to leave the Fairmont Hotel, petitioner became president and 35-percent owner of Omni Hotel Management Corporation (Omni Management) and Max Schnallinger *13 Restaurant Corporation (MS). Omni Management owned the management contracts on the Omni Hotel and its restaurants. [3] ICC also agreed to finance 5 restaurants in the complex, and MS was formed to develop and manage them. Because of his 35-percent ownership of MS, it was intended that petitioner would own 35 percent of each of the 5 restaurants. [4] However, because of financing difficulties and development delays experienced by ICC, petitioner in 1975 traded his right to receive a 35-percent interest in 5 proposed restaurants for a 100-percent interest in one restaurant. Mimi's Atlanta, Inc. (Mimi's, Inc.) was incorporated in the State of Georgia on September 10, 1975 for the purpose of purchasing and operating Mimi's restaurant in the Omni complex. The initial outstanding stock of the corporation consisted of 700 shares of Class A common stock issued to petitioner and 300 shares of Class B common stock issued to Richard Clifton. The Articles *14 of Incorporation provide that "the Class A shares and the Class B shares shall each vote independently as a class on all matters that come before the shareholders of the corporation and the aggregate vote of each class shall be equal to the aggregate vote of the other." The initial board of directors of Mimi's, Inc. consisted of petitioner, Richard Clifton and Brannon B. Lesesne, Jr. By resolution dated January 20, 1976, the board of directors of Mimi's, Inc. exercised its option to purchase Mimi's restaurant in the Omni International complex from ICC et al. as specified in their agreement dated September 1975. Pursuant to said purchase, Mimi's, Inc. executed a promissory note in the amount of $789,457 which was guaranteed by petitioner and Richard Clifton. Richard Clifton resigned as an officer and director of Mimi's, Inc. on April 29, 1976. Pursuant to a stock purchase agreement dated July 26, 1976, Mimi's, Inc. acquired all the Class B common stock of Richard Clifton.At all times subsequent to that date until January 8, 1977, petitioner was the sole shareholder of all of the outstanding shares. During the remainder of 1976, Brannon Lesesne and petitioner continued as the *15 only directors of Mimi's, Inc. American Restaurant Corporation (ARC) was incorporated in the State of Georgia on December 10, 1975. During 1976 the outstanding stock of ARC was owned solely by petitioner. ARC was formed for the purpose of managing several restaurants to be constructed and owned by ARC and others. A management team, consisting of petitioner, Ullrich Engle, Martin O'Dowd, and Douglas McKendrick, was employed by ARC and Mimi's, Inc. to manage several restaurants simultaneously. Ullrich Engle was a corporate chef with 5-star restaurant experience, who was also experienced in the design of kitchens and the supervision of the preparation and presentation of food.Like petitioner, Martin O'Dowd was experienced in the designing, opening and managing of restaurants. Brannon Lesesne was a financial advisor and director of Mimi's, Inc., and Douglas McKendrick was a certified public accountant. [5] Petitioner anticipated giving or selling ownership interests in ARC and those restaurants owned by it to his management team. Further, it was contemplated that ARC would seek investments in various of its restaurants from other sources and would build and own interests in other *16 restaurants. Mimi's restaurant was initially designed and built to operate as a coffee shop and hamburger restaurant for the Omni International Hotel, As such, its kitchen was designed as a "satellite" kitchen to be used for finishing certain dishes, grilling or frying already prepared or half-prepared food and preparing a simple menu. The kitchen had little storage space, working room, equipment or facilities to prepare full meals. For this reason, and as provided in the contract of purchase, Mimi's restaurant had the contractual right to rely on the main kitchen of the hotel for the preparation of certain food items and for the use of certain of the hotel's equipment. Immediately after Mimi's, Inc. purchased Mimi's restaurant, it was no longer operated as a coffee shop. Rather, it adopted a more sophisticated menu that required the preparation of full meals. The menu was upgraded both to take advantage of the type of clientele frequenting the restaurant and to make the restaurant more profitable. The changes in the menu amplified the inadequacies of Mimi's kitchen. Because of inadequate *17 storage and refrigeration space, food could not be prepared in advance and stored. Instead, deliveries of food were required to be received continuously throughout the day and into the evening. j In addition, the restaurant suffered from pilferage of the food and liquor stored in the corridors of the restaurant. Because food could not be prepared in advance and stored, extra shifts of employees were required to prepare the meals as needed. Response time and the quality of the food suffered. Although fresh stock, the main ingredient in sauces, is essential to the entrees prepared by such restaurants, Mimi's had no equipment to prepare its own and had to rely on inferior canned stocks. Moreover, the restaurant had no butchering capabilities and therefore was required to pay for continuously delivered butchered meat. The restaurant could not rely on its ability to use the hotel kitchen to solve these problems. Despite the difficulties with its kitchen, however, Mimi's was a very successful restaurant, as were most of the other restaurants then operating in the Omni complex. Mimi's, Inc. had retained earnings of $16,816 for the fiscal year ended April 30, 1976 and $277,985 for the *18 fiscal year ended April 30, 1977. In order to alleviate the problems associated with preparing a more sophisticated menu in a "satellite" kitchen, the management of Mimi's, Inc. began a search for additional space for a kitchen. Because of the configuration of the Omni complex and the location of the restaurant, Mimi's was unable to expand its kitchen in its current location. Therefore, the management team approached the managers of the Omni complex for the purpose of renting space solely for the purpose of constructing a kitchen. Mimi's, Inc. sought to lease the only available space in the Omni suitable for Mimi's kitchen which happened to be across the corridor from its current location. [6] The management of the Omni complex, however, considered this space a prime location for another complete restaurant and refused to lease the space strictly for a kitchen. It was suggested instead that an entirely new restaurant be built in this space. To encourage the construction of the new restaurant, the management of the Omni complex offered a substantial tenant allowance and offered assistance in obtaining a Small Business Administration (SBA) guaranteed loan. *19 Max's Restaurant, Inc. (Max's, Inc.) was incorporated in the State of Georgia on August 3, 1976 as a wholly owned subsidiary of ARC. Max's, Inc. was formed for the purpose of constructing and operating Max's restaurant in the space directly across from Mimi's restaurant. Petitioner, Mr. Engle and Mr. Dowd designed Max's restaurant with a kitchen of sufficient size to serve not only the needs of the new restaurant, but also to serve as the main kitchen for Mimi's restaurant. On November 30, 1976 the First Georgia Bank made a $555,000 construction loan to Max's, Inc. This loan was guaranteed by petitioner, Mimi's, Inc., ARC and the SBA. One of the conditions of the loan which was required by the SBA and the First Georgia Bank was that Max's, Inc. obtain a loan of $117,000 from Mimi's, Inc. and enter into a stand-by agreement subordinating that loan to the bank's loan. On December 1, 1976, the parties executed the following documents evidencing the transfer of $117,000 from Mimi's Inc. to Max's, Inc.: (1) loan agreement between Mimi's, Inc. and Max's, Inc.; (2) promissory note in the amount of $117,000; (3) action of the board of directors of Mimi's, Inc. authorizing these transactions; *20 and (4) action of the board of directors of Max's, Inc. authorizing these transactions. During 1976, Mimi's, Inc. provided total funds to Max's, Inc. in the amount of $119,746. The transfers of these funds were consistently treated by the parties and their accountant as loans. The advances were shown on Mimi's, Inc.'s financial statements as notes receivable and on Max's, Inc.'s financial statements as long-term debt. Interest accrued on this obligation at the rate of 6 percent and was posted on the corporate records. The advances were secured by a second security interest in all the assets of Max's, Inc. Max's, Inc. was required by the terms of the security agreement to insure the collateral, keep it in good repair, and prevent any further encumbrances. Petitioner and his advisors believed that the Omni complex would attract a sufficient number of people so as to generate significant business for the two restaurants and that the opening of the second restaurant would provide the needed kitchen space for Mimi's as well as other cost savings. The businesses in the Omni complex existed in a symbiotic relationship in which the success of one business promoted the success of the *21 others by drawing additional people to the complex. Because of the unforeseen financial collapse of the "World of Sid & Marty Krofft" shortly before the opening of Max's restaurant and the sale of the hockey team, two of the main attractions to the Omni were lost. The restaurants and other businesses were dependent upon these indoor entertainment attractions.As the result of their loss, the businesses in the Omni complex (including the restaurants) suffered. For these reasons, Max's restaurant was unable to perform as projected, and the advances from Mimi's, Inc. were not repaid. On January 8, 1977, ARC acquired the total outstanding stock of Mimi's, Inc. from petitioner. Subsequent to that date, ARC filed consolidated income tax returns with Mimi's, Inc. and Max's, Inc. All the outstanding stock of Max's, Inc. and Mimi's, Inc. was sold to Steven A. Brown, individually, and Steven A. Brown and Associates, Inc. on April 11, 1979. In his notice of deficiency respondent determined that the advances of funds in 1976 totaling $119,746 from Mimi's, Inc. to Max's, Inc. constituted a constructive dividend to petitioner in that year. OPINION The sole issue for decision is whether *22 respondent properly determined that the advances made by Mimi's, Inc. to Max's, Inc. in 1976 totaling $119,746 constituted a constructive dividend to petitioner and thus taxable income to him in that amount, less the $100 dividend exclusion of section 116. [7]
Section 301 provides that a distribution of property made by a corporation to a shareholder with respect to its stock shall be included, to the extent that it is a dividend, in the gross income of the shareholder. Section 316(a) defines the term "dividend" as any distribution of property made by a corporation to its shareholders out of its accumulated earnings and profits or out of its earnings and profits of the current taxable year. No formal dividend declaration need be made nor must the distribution be made directly by the corporation to the shareholder. Yelencsics v. Commissioner,74 T.C. 1513, 1529 (1980). *23 That the distribution is not recorded on the corporate books, as such, is of no consequence. Silverstein v. Commissioner,36 T.C. 438, 433 (1961). Moreover, it is well established that a transfer of property between two corporations may constitute a dividend to an individual who has an ownership interest in both corporations. Binenstock v. Commissioner,321 F.2d 598, 601-602 (3d Cir. 1963), affg. sub nom. Makransky v. Commissioner,36 T.C. 446 (1961); Rapid Electric Co. v. Commissioner,61 T.C. 232, 239 (1973). Where funds are transferred from one related corporation to another, the constructive dividend theory is that the property is distributed by the transferor corporation to the common stockholder as a dividend and then to the transferee corporation by the stockholder as a capital investment. Sammons v. Commissioner,472 F.2d 449, 453 (5th Cir. 1972), affg. in part and revg. in part and remanding a Memorandum Opinion of this Court. However, a transfer of funds between two corporations will not *24 result in a constructive dividend to shareholders merely because the transferor and transferee corporations are commonly owned. Joseph Lupowitz Sons, Inc. v. Commissioner,497 F.2d 862, 868 (3d Cir. 1974), affg. on this issue a Memorandum Opinion of this Court. No constructive dividend exists where the transfer represents a bona fide loan, or even though not a loan, if the common shareholder receives only an indirect or derivative benefit from the transfer. The existence of a direct versus indirect benefit usually depends upon the existence of a business purpose on the part of the corporate transferor. Gilbert v. Commissioner,74 T.C. 60, 64-67 (1980). However, if a transfer between related corporations does not constitute a bona fide loan, the transfer can result in a constructive dividend to the common shareholder if it was made primarily for his benefit and if he received a personal benefit therefrom even if the funds do not pass through his hands. Gilbert v. Commissioner,supra at 64; Schwartz v. Commissioner,69 T.C. 877, 884 (1978); Rapid Electric Co. v. Commissioner,supra. *25 It is respondent's contention that the intercorporate advances of funds by Mimi's, Inc. to Max's, Inc. in 1976 were distributions for the direct benefit of petitioner and, as such, constitute taxable dividends to him. In contrast, it is petitioner's position that the intercorporate transfers constituted bona fide loans to Max's, Inc. Further, petitioner argues that he did not receive a direct benefit as the result of such transfers. The existence of a bona fide loan is an issue of fact, and its resolution turns upon the particular circumstances of each case. Schwartz v. Commissioner,supra at 884. Respondent's determination in the notice of deficiency is presumed to be correct, and petitioner bears the burden of proving it in error. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). The existence of bona fide debt between related corporations requires an analysis *26 of various factors. We must determine whether there was a genuine intention to create a debt with a reasonable expectation of repayment and whether that intention comported with the economic reality of creating a debtor-creditor relationship. Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 377 (1973). As no mechanically precise test is capable of formulation, the answer depends upon the weighing of factual criteria. Gilbert v. Commissioner,supra at 65. After careful consideration of the evidence presented and for the reasons set forth below, we conclude that the intercorporate transfers in issue were, in fact, bona fide loans. First, at the time the advances were made, repayment was contemplated by the parties, and such expectation was reasonable. [8] Petitioner had extensive experience in the designing and managing of restaurants and was intimately involved in the planning of the restaurants for the Omni complex. Mimi's restaurant had been phenomenally successful from its inception, and there was every indication that its success would continue. One of the major attractions planned for the Omni complex, the "World of Sid and *27 Marty Krofft," was expected to open about the time Max's restaurant opened, and it was anticipated that the accompanying increased volume of people attracted to the complex would provide substantial business for the restaurant. While respondent argued that the restaurants would compete with each other, the testimony shows that there was often a 1-1/2 to 2-hour wait for a table at Mimi's and other restaurants in the complex and that the increasing crowds would provide more than adequate business for both restaurants. In addition, cash flow projections demonstrated that both the $555,000 SBA guaranteed loan and the advances from Mimi's, Inc. would be repaid. It is not uncommon for such businesses to be formed with a large debt structure. Given petitioner's experience in the restaurant business and his success with Mimi's restaurant, we do not think it unreasonable for the parties to expect that Max's restaurant would be equally successful. [9] The fact that unforeseen adverse events devastated the business of both restaurants and prevented the repayment of the advances does not change their character at the *28 time they were made. The financial collapse of one of the complex's major attractions and the sale of the hockey team caused the demise of many of the dependent businesses. Second, Mimi's Inc. had an independent business purpose for lending funds to Max's, Inc. The kitchen in Mimi's restaurant was originally designed for preparing only a very simple menu, and its facilities proved inadequate for preparing the more sophisticated menu which the restaurant adopted soon after its purchase by Mimi's, Inc. Petitioner estimated that, even if a space had been available in the Omni complex suitable for an expanded kitchen, it would have cost approximately $150,000 to $200,000 to construct and equip. The construction of an entire new restaurant near Mimi's restaurant with enough kitchen space to serve both restaurants benefitted Mimi's, Inc. Moreover, it was intended that substantial cost savings would result from bulk purchasing, shared use of equipment and storage as well as shared advertising, management and employee costs. *29 Third, these advances were consistently treated as demand loans on the books of the two corporations, and interest was accrued. The transfers were shown on Mimi's, Inc.'s financial statements as notes receivable and on Max's, Inc.'s financial statements as long-term debt. A loan agreement and promissory note were signed, and the board of directors of each corporation authorized the transactions. The advances were secured by a second security interest in the assets of Max's, Inc. We are mindful that consistent bookkeeping practices, without accompanying objective economic indicia of debt, is little more than a declaration of intent. Gilbert v. Commissioner,supra at 65; Dean v. Commissioner,57 T.C. 32, 44 (1971). However, in this case the use of the nomenclature of debt supports the other objective factors demonstrating economic reality. On brief, respondent makes much of his inability to elicit a satisfactory response from petitioner as to why he chose to structure these advances as loans rather than equity investments. Respondent argues that this perceived lack of candor on petitioner's part evidences that the advances were made for *30 petitioner's benefit and thus constitute constructive dividends. Undoubtedly petiioner was aware of the tax planning benefits of Mimi's, Inc. loaning funds to Max's, Inc. rather than causing Mimi's, Inc. to declare a dividend to petitioner and then contributing the remaining after tax dollars to Max's, Inc. as a capital contribution. While respondent would naturally prefer the latter scenario, we cannot conclude that petitioner's implied knowledge that intercorporate loans would provide more favorable tax consequences somehow undercuts his position herein. It has long been recognized that taxpayers have the right to arrange their affairs so their taxes will be as low as possible. Gregory v. Helvering,293 U.S. 465, 469 (1935). What a taxpayer did, rather than what he might have done, determines his liability. Seminole Flavor Co. v. Commissioner,4 T.C. 1215, 1230 (1945). The issue before us is whether the intercorporate advances were in fact bona fide loans and that issue is to be resolved on the basis of the objective evidence in the record. We have *31 concluded that petitioner has met his burden of proof. Rule 142(a). Accordingly, we hold that no part of these transfers in 1976 totaling $119,746 constitutes taxable income to petitioner. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Petitioners have conceded that losses incurred in the abandonment of certain partnership interests in 1975 and 1976 were capital rather than ordinary in nature. In addition, the parties have agreed that petitioners are entitled to ordinary losses from the Landings II Associates partnership in the following amounts in addition to the amounts allowed in the notice of deficiency: Increase over notice
Year
of deficiency
1975
$7,408
1976
5,086
1977
4,690
1978
429
1979
238
These amounts are consistent with the settlement reached in the audit of the general partner of Landings II Associates.↩
2. Dorothy Schnallinger is a party to this proceeding solely because she filed joint tax returns with her husband for the taxable years before the Court. Hereinafter all references to petitioner in the singular will refer to Maximillian Schnallinger.↩
3. Omni Management also owned the management contracts on 5 Sheraton franchises and a luxury resort in Austin, Texas. ↩
4. Neither Omni Management nor MS Corporation owned any of the real estate or buildings involved in the Omni complex.↩
5. Mr. McKendrick was not employed by any of the corporations until October 1976.↩
6. Petitioner estimated that the cost of an expanded, fully equipped kitchen for Mimi's would be approximately $150,000 to $200,000.↩
7. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
8. See Swain v. Commissioner,T.C. Memo. 1981-716↩.
9. Obviously the SBA was convinced of the merits of the project since it agreed to guarantee a loan more than four times the amount of the advances in issue.↩