ESTATE OF ABRAHAM WEISSBART, DECEASED, HELEN WEISSBART, EXECUTRIX, AND HELEN WEISSBART, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Weissbart v. Commissioner
Docket No. 39575-87
United States Tax Court
T.C. Memo 1992-38; 1992 Tax Ct. Memo LEXIS 44; 63 T.C.M. (CCH) 1845; T.C.M. (RIA) 92038; January 21, 1992, Filed *44 Decision will be entered under Rule 155. Wallace Musoff, for petitioners. Lawrence P. Blaskopf, for respondent. WHALEN, Judge. WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in, and additions to petitioners' Federal income tax as follows: Additions to Tax
Year
Deficiency Sec. 6661
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1981
$ 62,476.26
$ 15,619.00
$ 3,123.80
50% of     1982
107,377.75
26,844.43
5,368.88
interest due on
1983
86,406.85
21,601.71
4,320.34
each deficiency
All section references are to the Internal Revenue Code as amended unless otherwise stated. After concessions, the issues for decision are: (1) Whether Mr. Weissbart received constructive distributions during 1981, 1982, and 1983 from a corporation in which he owned stock; (2) whether Mr. Weissbart realized $ 100,000 in January of 1983 from the sale of 50 percent of his stock in the above-mentioned corporation; (3) whether Mr. Weissbart realized $ 270,833.35 in June of 1983 from the sale of the remainder of Mr. Weissbart's stock in the above-mentioned corporation, which amount must be recognized, in part, as gain from the sale or exchange *45 of a capital asset and, in part, as income from a covenant not to compete; (4) whether petitioners are liable for the additions to tax under section 6653(a)(1) and (2) determined by respondent; (5) whether petitioners are liable for additions to tax under section 6661 determined by respondent; and (6) whether petitioner Helen Weissbart qualifies as a so-called innocent spouse pursuant to section 6013(e). Several days before trial, respondent filed Motion for Leave to File an Amendment to Answer and he lodged an Amendment to Answer with the Court. After hearing respondent's motion, the Court agreed with petitioners that one of the matters, described therein as "Forgiveness of debt from State News, Inc. in connection with sale of stock in June, 1983," was a new issue which could not be raised at trial without prejudice to petitioners. On the other hand, the Court agreed with respondent that the other matters set forth in the Amendment to Answer are refinements of the deficiencies determined in the notice of deficiency. As to these, the Court directed that the burden of proof remained on petitioners. The Court issued an order granting respondent's motion, "except for the forgiveness *46 of debt issue." Petitioners did not object to this order. After trial, respondent filed Motion to Conform Pleadings to Proof in which he asks the Court for leave to file a second amendment to answer. In the Second Amendment to Answer which he lodged with the Court, respondent proposes to revise his computation of the tax deficiencies at issue, as set forth in his Amendment to Answer, by making four changes. One change is to remove the forgiveness of debt income which the Court did not permit respondent to raise. The other three changes revise the amounts of income which respondent determined to have been constructively distributed to Mr. Weissbart. Two of these changes reduce the amount of such income for the year 1981, and one change increases the amount of such income for the year 1982. The Court agrees with respondent's contention that each of these three changes is based upon the proof at trial. Accordingly, respondent's Motion to Conform Pleadings to Proof has been granted. We note that respondent's Second Amendment to Answer asserts the following tax deficiencies and additions to tax: Additions to Tax
Year
Deficiency Sec. 6661
Sec. 6653(a)(1)
Sec. 6653(a)(2)
1981
$ 29,585
$ 7,396
$ 1,479
50% of the   1982
146,826
36,707
7,341
interest due on
1983
49,104
12,276
2,455
each deficiency
*47 FINDINGS OF FACT Some of the facts have been stipulated by the parties and are so found. The stipulation of facts filed by the parties and the exhibits attached thereto are incorporated herein by this reference. Mr. Abraham Weissbart had been married to petitioner Helen Weissbart for more than 42 years at the time of his death on September 17, 1987. His last will and testament appoints Mrs. Weissbart to act as executrix of his estate, and it provides that she is to receive the residue of his estate. During the course of their marriage, Mr. Weissbart dominated the couple's business and financial affairs. He adamantly refused even to discuss those affairs with Mrs. Weissbart. He gave Mrs. Weissbart a weekly allowance of $ 200 for household expenses. She acceded to his control of the couple's affairs. She did not ask questions about those affairs or involve herself in them. As of January 1, 1981, Mr. Weissbart was the sole shareholder of State News, Inc. (State News), a New Jersey corporation, which operated newsstands at several locations, including the Port Authority Bus Terminal, the CBS building, and the George Washington Bridge Bus Terminal. He was in sole control of *48 the operation of State News at that time. Mrs. Weissbart is listed as assistant manager of State News on the couple's income tax returns for 1981 and 1982, and the Forms W-2 attached thereto state that she received wages from State News in the amount of $ 13,000 in 1981 and $ 7,750 in 1982. Similarly, she is listed as a director of State News on the Annual Report By Domestic or Foreign Corporation for the State of New Jersey which was filed by State News in 1981. However, Mrs. Weissbart was never involved with the affairs of State News in any capacity. Mr. Weissbart was a chronic gambler. On at least one occasion, he went to a sanitarium for professional help to control his gambling, but the treatment did not help. He regularly went to Atlantic City once or twice during the year to gamble. He allowed Mrs. Weissbart to accompany him on these trips, but he did not allow her to be with him while he gambled. In addition, there were occasions when Mr. Weissbart disappeared for a day or two at a time. On these occasions, Mrs. Weissbart suspected that he had gone on gambling trips. She did not know the full extent of his gambling. During 1981, Mr. Weissbart drew checks payable *49 to gambling casinos in the aggregate amount of approximately $ 70,000. Beginning in June or July of 1982, Mr. Weissbart permitted two individuals, Messrs. Jay Fontana and Richard Tikijian, to begin overseeing the operations of State News. Mr. Weissbart owed money to Messrs. Fontana and Tikijian, but the record does not fully reveal how much he owed to them or the nature of their business relationship. Messrs. Fontana and Tikijian ran the day-to-day operations of State News, and they made daily collections of cash receipts from the newsstands. Between June or July of 1982, the time when Messrs. Tikijian and Fontana arrived on the scene, and October 14, 1982, Mr. Weissbart made a series of cash deposits totaling $ 352,946 to the Fidelity Union Bank. The amount of each deposit exceeded $ 10,000. Mr. Tikijian had an account at Fidelity Union Bank. Mr. Weissbart did not have an account there. In a contract dated January 19, 1983, Mr. Weissbart agreed to sell 50 percent of the common stock of State News to a corporation owned and operated by Messrs. Fontana and Tikijian, Newstand Enterprises, Inc. (Newstand Enterprises). We refer to that document herein as the January contract. *50 It provides as follows: 2. Consideration. The purchase price of the shares shall consist of cash and other considerations, as follows: (a) The "cash consideration" shall be $ 100,000 of which $ 30,000 shall be paid to Seller on the execution hereof and the balance shall be paid in two installments, $ 20,000 not later than sixty (60) days from the date of execution hereof, and $ 50,000 not later than one hundred and fifty (150) days from the date of execution hereof, provided, however, that Purchaser may, with respect to the second installment, extend said date up to but not exceeding one hundred and twenty (120) additional days, by at least ten (10) days written notice to Purchaser in advance of the date when such second installment would otherwise be due, as aforesaid. (b) The M.J. Williams Corporation has heretofore loaned to the Company [State News], the principal amount of $ 201,900 which is evidenced by a promissory note of the Company in said principal amount, dated June 23, 1982, and due and payable on demand. Seller has personally guaranteed said promissory note in writing. Seller and Purchaser agree that the "other consideration" shall be the modification *51 of said guarantee whereby Seller will continue to guarantee repayment of principal and interest of said Note but only to the extent of $ 100,950 of principal amount thereof. The principal balance of the said loan or $ 100,950 shall be personally guaranteed by Jay Fontana and Richard Tikijian, principal shareholders of Newstand. Said modification shall be in form and substance satisfactory to Seller and Seller's attorneys. Payment of the cash consideration shall be by certified or bank cashier's checks on New York funds, payable to the order of the Seller. The Purchaser agrees to pay all transfer taxes, stamp taxes, or sales taxes, if any, arising out of the purchase of the Shares.
Five months later, Mr. Weissbart and Newstand Enterprises entered into an agreement dated June 9, 1983, to sell their stock in State News to two individuals, Mr. Kirtisinh Chudesama and Mr. Bhuznesh Kapoor. We refer to that agreement herein as the June Agreement. It included a restrictive covenant under which the sellers, Mr. Weissbart and Newstand Enterprises, and Messrs. Fontana and Tikijian agreed not to operate a newsstand in the Port Authority facilities where State News was already established *52 until after October 14, 1991, and they agreed not to operate a newsstand in any other Port Authority location for 3 years. October 14, 1991, was the expiration date of the lease covering the existing locations of State News in the Port Authority facilities. Under the terms of the June Agreement, the total purchase price is $ 3.4 million, of which $ 2.2 million is specifically allocated as consideration for the sellers' stock in State News and $ 1.2 is specifically allocated as consideration for the restrictive covenant. The June Agreement states that the portion of the purchase price which was to be paid for the sellers' State News stock, $ 2.2 million, was determined on the "basis of appraisals" of the company's assets. It lists the assets of State News and the value of each of those assets, as follows: Inventory and stock in trade
$ 450,000  Chattels, fixtures and equipment
450,000
Leasehold
450,000
Good will
80,000
Lottery
770,000
Total
$ 2,200,000
The June Agreement provides that on the closing date, June 27, 1983, the purchasers were to pay cash in the amount of $ 600,000 (of which their deposit of $ 50,000 was to be a part) and they were to assume debts *53 of State News in the aggregate amount of $ 600,000. It further provides that they were to pay the balance of the purchase price, $ 2,200,000, in monthly installments beginning on August 15, 1983. Each of the first 12 monthly installments was to be in the amount of $ 8,333.33, an amount computed without interest, and each of the next 12 installments was to be in the amount of $ 25,000, an amount also computed without interest. The June Agreement further provides that the purchasers would pay 108 monthly installments of $ 22,512 commencing on August 15, 1985, and continuing through July 15, 1994. This amount includes interest of 7 percent calculated on the unpaid principal balance of $ 1,800,000 at August 15, 1985. At closing, the total cash payment due from the purchasers was reduced to $ 500,000 from $ 600,000, and the debts of State News, which the purchasers agreed to assume, was increased to $ 700,000 from $ 600,000. Accordingly, the purchasers, Mr. Chudesama and Mr. Kapoor, paid the sellers $ 450,000 in certified checks, they allowed another $ 50,000 to remain in escrow with Mr. Weissbart's attorney, they assumed $ 700,000 of State News' debts, and they executed a series *54 of 132 promissory notes to the sellers under which the balance of the purchase price, $ 2,200,000, was to be paid in monthly installments, as described above. As the owner of 50 percent of the stock of State News prior to the closing of the June Agreement, petitioner was entitled to receive one-half of the payments due under the June Agreement. During 1983, this amounted to $ 270,833.35 and was composed of the following payments: One-half
Total Share Purchasers' deposit
$ 50,000.00 $ 25,000.00 Cash payment at closing
450,000.00
225,000.00
Installments due on:
Aug. 15, 1983     $ 8,333.33
Sep. 15, 1983     8,333.33
Oct. 15, 1983     8,333.33
Nov. 15, 1983     8,333.33
Dec. 15, 1983     8,333.33
41,666.65
20,833.35
Total
$ 541,666.65
$ 270,833.35
Among other things, the purchasers wanted to assure themselves that Mr. Weissbart, Mr. Tikijian, and Mr. Fontana would not bid for the existing location of State News in the Port Authority facilities when the lease of that location expired on October 14, 1991. The parties to the June Agreement agreed that payments under the restrictive covenant would not begin until after the buyers had finished *55 paying for the stock purchase, thus deferring payment under the restrictive covenant until the lease would be renewed and the covenant honored. An attorney, Arthur J. Katzman, Esquire, who represented the sellers in the transaction, described this provision in a letter to the sellers dated July 8, 1983, as follows: With regard to the $ 1.2 million for the restrictive covenant executed by you and Jay Fontana and Richard Tikijian the contract provided for its payment at the constant successive monthly installments of $ 22,512.00, the due date of the first of said notes being in whole or in part following the payment of the unpaid balance of the purchase price. * * *
On or about June 5, 1978, Mr. and Mrs. Weissbart purchased a condominium at the Lakes of Inverrary in Lauderhill, Florida. They paid cash of $ 20,300 and assumed a mortgage in the principal amount of approximately $ 24,700. In 1980, Mr. Weissbart purchased two other properties in Lauderhill, Florida. Both properties were single family houses. The first, located at 6901 N.W. 44th Court, was purchased on or about February 15, 1980. Mr. Weissbart and his son, Louis, paid $ 66,260.94 at the closing *56 and assumed a mortgage in the principal amount of $ 87,300. The second, located at 6921 N.W. 44th Court, was purchased on or about April 30, 1980. Mr. Weissbart and his son, Louis, paid $ 54,925.71 at closing and assumed a mortgage on the property in the principal amount of approximately $ 123,643.36. On or about October 20, 1987, Mrs. Weissbart sold the Florida condominium for $ 55,000. The closing statement for that transaction shows that the buyer assumed a mortgage in the principal amount of approximately $ 34,932.61 and made a net payment to Mrs. Weissbart of $ 14,271.58. On or about January 20, 1988, Mrs. Weissbart and her son sold the single family house located at 6921 N.W. 44th Court for $ 160,000. The closing statement for that sale shows that the buyer assumed a mortgage on the property in the principal amount of approximately $ 118,397.15 and made a net payment to Mrs. Weissbart and her son of $ 29,080.87. During the years in issue, the Weissbarts lived in a home located at Englewood Cliffs, New Jersey, which they had purchased on or about August 28, 1978, for $ 146,000. The settlement statement for that purchase shows that Mr. Weissbart *57 paid $ 46,493.95 in cash and borrowed $ 100,000.00. After Mr. Weissbart's death, Mrs. Weissbart sold the home on or about August 26, 1987, for $ 540,000. The settlement statement for that sale shows that Mrs. Weissbart paid loans against the property in the aggregate amount of $ 252,229.48 and received net proceeds from the sale of $ 231,385.94. Respondent's agents examined the U.S. Corporation Income Tax Returns (Forms 1120) of State News for 1981, 1982, and 1983. Based upon that examination, respondent determined that State News had underreported its income from three sources in the following amounts: Unreported Income
1981 1982 1983 Retail sales  $ 185,147
$ 103,667
$ 119,344
Commissions from  Lotto sales    19,208
135,445
-0-  Rack and Display  allowance    -0-  -0-  55,522
Total
$ 204,355
$ 239,112
$ 174,866
Respondent computed the above unreported retail sales of State News using a so-called percentage markup method. Under that method, respondent determined a representative percentage markup for each category of merchandise sold by the corporation and applied that percentage to the cost of the merchandise in each category which was *58 sold by the corporation. Respondent reduced the gross sales thus computed by 4.5 percent of the total to account for theft losses. Respondent used this indirect method of determining the retail sales of State News because books and records of the corporation accounting for cash sales had not been provided to his agent during her audit of State News. Respondent later revised his computation of the unreported income of State News, and he set forth the recomputed amounts in his Second Amendment to Answer as follows: Unreported Income
1981 1982 1983 Retail sales  $ 181,901
$ 215,147
$ 145,435
Commissions from  Lotto sales    -0-  151,684
-0-  Rack and Display  allowance    -0-  -0-  -0-  Total
$ 181,901
$ 366,831
$ 145,435
Respondent's agents also examined the joint Federal income tax returns filed by Mr. and Mrs. Weissbart for 1981, 1982, and 1983. Those returns report that Mr. and Mrs. Weissbart realized income from the following sources: 1981
1982
1983 Wages - State News
Abraham Weissbart  $ 49,400
$ 54,650
$ 31,200 Helen Weissbart  13,000
7,750
-0- Interest
Note receivable  2,802
3,231
3,848
Banks  3
1,793
1,816
Dividends
-0- -0- 164
Installment sales
Cut Rate Inc.  8,864
8,864
8,864
State News  -0- -0- 200,000
Rent on house in Florida
4,400
13,200
13,200
Refund - State income tax
2,381
2,959
2,558
$ 80,850
$ 92,447
$ 261,650
*59 Based upon his audits of State News and the Weissbarts, respondent determined that the unreported income of State News had been constructively distributed to Mr. Weissbart. For 1981 and 1982, when Mr. Weissbart owned all of the stock of State News, respondent treated all of the unreported income as having been constructively distributed to Mr. Weissbart. For 1983, in view of the fact that Mr. Weissbart sold half of his State News stock in January of 1983, and the other half in June of 1983, respondent determined that only 25 percent of the unreported income of State News for the year had been constructively distributed to Mr. Weissbart. Respondent concedes that his computation of the amount of the constructive distribution for 1983 using 25 percent of the unreported income for the whole year is incorrect. He contends the amount of the constructive distribution for that year should be recomputed on the basis of 50 percent of the unreported income of the corporation prior to June 27, 1982, the closing date of the sale of Mr. Weissbart's stock to Messrs. Chudesama and Kapoor. In his notice of deficiency to petitioners, respondent treated the constructive distributions from State *60 News as dividends to Mr. Weissbart to the extent of the earnings and profits of State News, and he treated the excess as a return of Mr. Weissbart's adjusted basis in the stock of State News and as gain from the sale or exchange of property. See secs. 301(c) and 316(a). Mr. Weissbart owned all of the outstanding stock of State News at the beginning of 1981, and his adjusted basis in the stock at that time was $ 32,166. Initially, in his notice of deficiency, respondent determined that the earnings and profits of State News were: $ 19,775 in 1981, $ 147,184.50 in 1982, and $ 71,200.85 in 1983. Respondent changed those amounts in his Amendment to Answer to $ 0 in 1981, $ 251,588 in 1982, and $ 61,090 in 1983, and he revised his computation of the tax consequences to petitioners accordingly. In summary, respondent treated petitioners as having realized the following income from State News during the years in issue: 1981 1982 1983
Dividends
-0-   $ 251,588
$ 36,359
Gain from sale or
exchange of capital asset  $ 149,735
115,243
-0- His computation of these amounts, as set forth in his Second Amendment to Answer, is as follows: 1981
1982
1983 Unreported income
of State News  $ 181,901 $ 366,831
$ 145,435
Constructive
distribution  100%   100%  25%  181,901 366,831
36,359
Dividends
(earnings and profits  of State News)  -0-   251,588
36,359
Excess
181,901 115,243
-0-  Basis
<32,166>
-0-  -0-  Gain from sale
or exchange of  capital asset  $ 149,735 $ 115,243 $ -0-  *61 Respondent also determined that the 1983 return of Mr. and Mrs. Weissbart fails to report the gain which Mr. Weissbart realized from his sale of 50 percent of the stock of State News in January of 1983 to Messrs. Fontana and Tikijian. Initially, in his notice of deficiency, respondent determined that Mr. Weissbart had realized a capital gain of $ 50,000 from the sale, based upon the incorrect statement to that effect by Mr. Weissbart's accountant. In his Amendment to Answer, respondent increased the amount realized by Mr. Weissbart to $ 100,000, based upon the January contract. Lastly, in his notice of deficiency to petitioners, respondent adjusted the amount and character of the income which petitioners reported from the sale of Mr. Weissbart's half interest in State News to Messrs. Kapoor and Chudesama under the June Agreement. On their 1983 return, petitioners reported that they had received $ 200,000 out of a total of $ 1,100,000 from an installment sale of Mr. Weissbart's stock in State News. They applied a gross profit ratio which was computed on the assumption that Mr. Weissbart had a basis of $ 32,166 in the stock, and they reported net long-term capital gain from the *62 transaction of $ 194,152. Respondent made three adjustments to petitioners' reporting of this transaction. First, he increased the amount realized from $ 200,000 to $ 270,833.35, Mr. Weissbart's share of the aggregate payments called for during 1983 under the June Agreement. Second, he eliminated Mr. Weissbart's basis from the computation of gain, on the theory that Mr. Weissbart's basis had been fully absorbed in 1981 by the constructive distributions from State News, as described above. Third, he recharacterized $ 11,459 of the total installment payments to be made during 1983, $ 20,833.35, as attributable to the covenant not to compete and the remainder, $ 9,374, as attributable to the sale of Mr. Weissbart's stock. In effect, respondent allocated a portion of each installment payment to the covenant not to compete in the same ratio as the total payments under the covenant, $ 1.2 million, bears to the total deferred payments under the June Agreement, $ 2.2 million, i.e., 55 percent. In his notice of deficiency to petitioners, respondent determined that the Weissbarts are liable for additions to tax for negligence pursuant to section 6653(a)(1) and (2). He also determined *63 that the Weissbarts are liable for additions to tax for substantial understatement of income tax under section 6661. At the time of filing the petition, Mrs. Weissbart resided in Lauderhill, Florida. This was also the residence of Mr. Weissbart's estate. OPINION 1. Constructive Distributions from State News
As discussed above, respondent determined that State News had constructively distributed to Mr. Weissbart proceeds from its business amounting to $ 181,901 in 1981, $ 366,831 in 1982, and $ 36,359 in 1983. He based that determination on his findings that State News had realized income from two sources, retail sales and commissions from Lotto sales, which had not been reported on its Federal income tax returns. Respondent computed State News' unreported income from retail sales using a so-called percentage markup method, under which he applied a markup percentage to the cost of the merchandise sold by State News in order to arrive at the company's retail sales, and he reduced the amount of sales, thus computed, by 4.5 percent of the total to account for theft losses. Respondent computed State News' unreported income from Lotto commissions on the basis of weekly settlement *64 reports submitted by the company to New York's Lottery. Petitioners' position, in summary, is that State News had not realized the unreported income determined by respondent for 1981, 1982, and 1983, and that they did not receive any such income, even if it had. In arguing that State News had not realized the unreported income determined by respondent, petitioners focus principally upon the unreported retail sales, discussed below. While they do not concede that State News also failed to report Lotto commissions of $ 151,684 in 1982, as respondent determined, their argument that it had not realized such income is perfunctory and unconvincing. Respondent introduced into evidence weekly settlement forms on which State News accounted to New York's Lottery for its sales of lottery tickets and for the commissions on those sales which State News retained. Respondent also introduced the testimony of the bookkeeper for State News who said that the company realized commissions of $ 235,517.84 from sales of lottery tickets during 1982. The corporation's income tax return for 1982 reports $ 83,834 as "lottery income - commissions". Accordingly, we find that State News failed to report *65 commission income of $ 151,684 for the year 1982. Before discussing petitioners' argument that State News had not realized unreported income from retail sales, we note that petitioners do not object to several aspects of respondent's percentage markup computation. First, they do not question the efficacy of using the percentage markup method to determine the retail sales of a business like State News. Second, they do not object to the specific markup percentages used by respondent. In fact, there is evidence that respondent's agent arrived at those percentages in consultation with the accountant for State News. Third, they do not object to the cost figures for purchases and inventory which respondent used in his computation. Those figures were taken from the books of the corporation. Petitioners argue that respondent is wrong for having determined that the retail sales of State News were unreported in the years in issue principally for two reasons. First, they argue that respondent is not entitled to disregard the retail sales shown by the books and records of State News and to compute a different amount under the percentage markup method. They do not cite section 446(a) *66 which provides that "taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books", nor do they argue that respondent's approach is contrary to that provision. However, they rely on three cases in which this Court held that the Commissioner had improperly disregarded a taxpayer's books and records and had erroneously determined that the taxpayer's income was higher than the amount shown on the taxpayer's books. Shinkonis v. Commissioner, a Memorandum Opinion of this Court dated May 25, 1951; Miller v. Commissioner, a Memorandum Opinion of this Court dated January 18, 1951; McDonald v. Commissioner, a Memorandum Opinion of this Court dated November 11, 1944. Unlike each of the three cases cited by petitioners, respondent's agent found that certain books and records of State News which are necessary to account for cash receipts either did not exist or were not provided to her during her audit of State News. Her experience in this regard is confirmed by the findings of auditors employed by the Port Authority of New York and New Jersey who audited State News for the periods from November *67 1, 1979, to October 31, 1981, and from November 1, 1981, to October 31, 1983. The auditor's report of the first audit, dated December 8, 1982, states as follows: Our examination disclosed serious deficiencies in the Lessee's [State News'] record keeping and controls over cash receipts. Specifically, the Lessee's cash controls were weak in that the collecting, counting and depositing of cash receipts from the newsstands was primarily the responsibility of only one person, namely, Mr. Weissbart, President of State News, Inc. To make matters worse, the Lessee was not maintaining adequate records pertaining to the computation of sales based upon merchandise put into the stands and physical inventories, which is the primary control over newsstand receipts. State News also did not maintain a record of daily receipts by newsstand. * * *
Their report of the second audit, dated August 6, 1984, states as follows: Our examination disclosed serious deficiencies in the Lessee's [State News'] record keeping and control over cash receipts. Specifically, the Lessee was generally not maintaining adequate records pertaining to the computation of sales based upon physical inventories *68 and merchandise placed in the stands * * * We had reported on this problem in our prior audit report dated December 8, 1982.
We find that State News failed to provide respondent with adequate books and records of its retail sales. Accordingly, this case is not governed by the three opinions cited by petitioners, referred to above, in which each of the taxpayers maintained and produced adequate books and records. Rather, this case is governed by opinions dealing with taxpayers who fail to maintain or produce adequate records. In those cases, the Commissioner is entitled to compute a taxpayer's income using any reasonable method of calculation. E.g., Goodmon v. Commissioner, 761 F.2d 1522, 1524 (11th Cir. 1985), affg. an Oral Opinion of this Court dated April 19, 1984. For example, in circumstances similar to the present case, we have approved the Commissioner's use of the percentage markup method to reconstruct a taxpayer's income. See Dagner v. Commissioner, T.C. Memo. 1976-121, affd. without published opinion 588 F.2d 830 (6th Cir. 1978); Bollella v. Commissioner, T.C. Memo. 1965-162, affd. 374 F.2d 96 (6th Cir. 1967). *69 Second, petitioners argue that respondent's reconstruction of the income of State News must be rejected because the theft loss percentage allowed by respondent in his computation, 4.5 percent, is too low. Petitioners argue that respondent's computation disregards "special operating facts and circumstances of State News, Inc." which include the fact that the company's newsstands were in high crime areas and the fact that the company was forced to use temporary stands which were sometimes exposed to pedestrian traffic on all sides and, thus, were more vulnerable to theft and pilferage. Petitioners also argue that the theft loss percentage used by respondent "was based upon dissimilar business establishments." Petitioners contend that State News suffered theft losses of approximately 8 to 10 percent. Petitioners' argument fails for lack of proof. They presented no records to substantiate a higher theft loss percentage than the percentage used by respondent. Their contention that State News incurred theft losses of approximately 8 to 10 percent is based upon general testimony of a CPA for State News, Mr. Hermele, which we find unconvincing. In this regard, we note that the State *70 of New York used 2.3 percent as a theft loss allowance when it conducted a sales tax audit of State News. We also note that the Port Authority used 3 percent as a theft loss allowance when it audited the lease payments of State News which were based on sales. We turn to the second part of petitioners' argument that, even if State News had realized unreported income during the years in issue, neither Mr. Weissbart nor his wife received any part of that income as a distribution from State News. Petitioners tacitly concede that, if a shareholder receives a distribution from his or her corporation, either directly or constructively, then the shareholder may be taxed on the amount of the distribution under the rules set forth in sections 301(c) and 316(a). That is, the distribution may be treated as a dividend, to the extent of the earnings and profits of the corporation, and as gain from the sale or exchange of property, to the extent that the amount distributed exceeds the shareholder's adjusted basis of the stock. E.g., Truesdell v. Commissioner, 89 T.C. 1280, 1295 (1987); Chesbro v. Commissioner, 21 T.C. 123, 129 (1953), affd. 225 F.2d 674 (2d Cir. 1955). *71 Petitioners also tacitly acknowledge that a shareholder will be treated as having constructively received a dividend to the extent that the corporation has conferred an economic benefit on the shareholder which has the effect of distributing available earnings and profits without expectation of repayment. E.g., Truesdell v. Commissioner, supra at 1295. The sole issue raised by petitioners is whether State News had conferred such an economic benefit on Mr. or Mrs. Weissbart. This is a question of fact. Respondent determined in his notice of deficiency that it had. Petitioners, of course, bear the burden of proving that it had not. Rule 142 of the Rules of Practice and Procedure of this Court; Truesdell v. Commissioner, supra at 1292, 1295-1296; Alisa v. Commissioner, T.C. Memo. 1976-255; see generally Llorente v. Commissioner, 74 T.C. 260 (1980), affd. in part, and revd. and remanded in part 649 F.2d 152 (2d Cir. 1981). One argument which petitioners make is that the record in this case presents "not one scintilla of evidence * * * to show that the petitioners benefited in *72 any way from the alleged unreported income of State News, Inc." They point to the testimony of respondent's agent who stated that "she could not 'honestly' state that Abraham Weissbart 'benefited by one red cent as a result of the alleged unreported income'". Furthermore, they argue that the Weissbarts' "lifestyle and expenditures were entirely consistent with [their] reported income for each of the years involved". Petitioners misperceive their burden of proof. Respondent determined that State News provided a benefit to Mr. Weissbart in the amount of its unreported income and, thus, had constructively distributed that amount to him, or on his behalf. To prevail on this issue, petitioners must prove that respondent's determination is erroneous. Rule 142(a). However, petitioners complain that respondent "has consistently failed to show such benefit". The short answer to this complaint is that respondent is not required to make such a showing. The long answer is that for the reasons summarized below, there is ample evidence in the record to find that State News provided an economic benefit to Mr. Weissbart in each of the years at issue. The cases on which petitioners rely are *73 distinguishable from this case. In each of those cases, the Court held that the taxpayer had not necessarily received a benefit sufficient to treat the taxpayer as having received a constructive distribution from the corporation. See Palo Alto Town & Country Village, Inc. v. Commissioner, 565 F.2d 1388 (9th Cir. 1977), affg. in part, revg. and remanding in part T.C. Memo. 1973-223; Herbert v. Commissioner, 377 F.2d 65 (9th Cir. 1966), revg. T.C. Memo. 1964-223; Schwartz v. Commissioner, 69 T.C. 877 (1978); Estate of Wheeler v. Commissioner, T.C. Memo. 1978-15; Alisa v. Commissioner, supra. Unlike each of these cases, the record in this case shows that Mr. Weissbart benefited from the unreported income realized by State News during each of the years in issue. A second argument which petitioners make is that Mr. Weissbart's stock interest in State News is not sufficient by itself to prove that he controlled the corporation and could divert corporate monies to his own use. Petitioners argue that Messrs. Fontana and Tikijian took control of the operation *74 of the corporation beginning in June or July of 1982 and that it was they who diverted money from the corporation, while Mr. Weissbart attempted to "curtail shortages even to the extent of retaining an investigative firm". The first difficulty with this argument is that during the entire year 1981 and the first half of 1982, Mr. Weissbart owned all of the stock of State News and he had sole control over the corporation. There is ample evidence from which we infer that the unreported income of the corporation during that time was diverted by Mr. Weissbart to his personal use. For example, he collected the cash receipts of the corporation. The second difficulty is the fact that after Messrs. Fontana and Tikijian came onto the scene, sometime during the summer of 1982, it appears that Mr. Weissbart shared control of the corporation with them during the balance of 1982 through the middle of 1983. The nature of Mr. Weissbart's relationship with Messrs. Fontana and Tikijian is not fully described in the record of this case. Nevertheless, it is clear that they blatantly diverted funds from the corporation which the books of the corporation fail to show as having been spent for any *75 business purpose. Mr. Weissbart was fully aware of what was taking place and did nothing to put a stop to it. In fact, there is evidence that he participated in the removal of funds from the corporation. For example, he deposited cash totaling $ 352,946 to an account at Fidelity Union Bank between June and October of 1982. Based upon the record in this case, we find either that Messrs. Fontana and Tikijian shared the diverted funds with Mr. Weissbart, or that Mr. Weissbart received an indirect benefit from allowing Messrs. Fontana and Tikijian to divert the funds from State News to themselves. See Hardin v. United States, 461 F.2d 865, 871-873 (5th Cir. 1972); Cirelli v. Commissioner, 82 T.C. 335, 351 (1984). We also find that the level of Mr. Weissbart's benefit was in proportion to his stock ownership of the corporation. 2. $ 100,000 Gain Realized from January Contract
In January of 1983, Mr. Weissbart sold 50 percent of his stock in State News to a corporation owned and operated by Messrs. Fontana and Tikijian, Newstand Enterprises. The terms of that sale are set forth in the January contract and provide that Mr. Weissbart *76 was to receive "cash consideration" of $ 30,000 on the execution of the contract and two installment payments during 1983 totaling $ 70,000. In his notice of deficiency, respondent determined that Mr. Weissbart had realized $ 50,000 from that transaction during 1983 and treated such amount as gain from the sale or exchange of a capital asset. Respondent was permitted to amend his answer to increase the amount of gain from the transaction to $ 100,000 which is the total "cash consideration" under the January contract. In response to this adjustment, petitioners raise only the factual contention that "Mr. Weissbart received no part of the agreed purchase price of $ 100,000" under the January contract. The only evidence on which they base this contention consists of the testimony of their accountant, Mr. Hermele, who said that Mr. Weissbart told him, "I never got any money from them [i.e., Messrs. Fontana and Tikijian]". We are unconvinced by Mr. Hermele's testimony on this point because, among other things, it is clear that Mr. Weissbart was not always candid with Mr. Hermele and did not provide him with complete information about his affairs. In fact, Mr. Hermele admitted *77 that he had never seen the January contract, and he was misinformed about the purchase price for State News. There is nothing else in the record to suggest that Mr. Weissbart did not receive the payments under the January contract. We further note that, as discussed above, Messrs. Fontana and Tikijian removed a substantial amount of money from the corporation. Mr. Weissbart was well aware of their actions, and we infer that he was acting in concert with them. Petitioners have presented nothing to explain why Mr. Weissbart would have permitted Messrs. Fontana and Tikijian to take 50 percent of his business if he did not receive the cash consideration set forth in the January contract, either directly or constructively. 3. Treatment of the Proceeds Realized by Mr. Weissbart from the June Agreement
Respondent determined that Mr. Weissbart realized $ 270,833 during 1983 from the June Agreement. He determined that amount on the basis of Mr. Weissbart's share of the cash payments called for under the June Agreement. The buyers were to pay $ 500,000 at closing and were to pay five installments during 1983, each in the amount of $ 8,333.33. Mr. Weissbart owned 50 percent of *78 the stock of State News and, accordingly, he was entitled to receive one-half of the payment at closing, $ 250,000, and one-half of the installment payments during 1983, $ 20,833.33. Respondent treated Mr. Weissbart's share of the cash payment at closing, $ 250,000, as having been paid entirely for his stock in State News. Respondent treated Mr. Weissbart's share of the installment payments due during 1983, $ 20,833.33, as having been paid, in part, for his stock and, in part, for the covenant not to compete. His position is that the parties to the June Agreement had no valid business purpose to delay payments under the covenant not to compete until after the stock purchase was completed. Accordingly, respondent prorated each installment payment under the June Agreement to the covenant not to compete in the same ratio that the total due under the covenant, $ 1.2 million, bears to the total deferred payments under the June Agreement, $ 2.2 million, i.e., 55 percent. Thus, he allocated 55 percent of the installment payments due during 1983, $ 11,459, to the covenant and the remainder, $ 9,374, to the stock purchase. Respondent contends that the amount allocated to the covenant *79 is taxable as ordinary income. Petitioners contend that Mr. Weissbart only received $ 200,000, the amount reported. They also contend that the June Agreement allocates all payments under the contract to the purchase of the seller's stock and provides that payments under the covenant not to compete would commence after the stock was fully paid. We agree with respondent about the amount which Mr. Weissbart realized during 1983 from the sales of his State News stock under the June Agreement. There is no creditable evidence in the record to contradict the June Agreement which provides that Mr. Weissbart was to receive $ 270,833 during 1983. There is no proof that he received only $ 200,000. Accordingly, respondent must be sustained on this point. Rule 142(a), Tax Court Rules of Practice and Procedure.
We agree with petitioners, however, that no portion of the amount thus realized during 1983 is allocable to the covenant not to compete. It is evident that in negotiating the June Agreement both the buyers and sellers were concerned about whether State News would obtain a renewal of the lease covering its facilities in the Port Authority of New York and New Jersey bus terminal when *80 the lease for that space expired on October 14, 1990. For example, one provision of the June Agreement states that if the lease were not renewed or extended by July 1, 1989, for a period of at least 4 years from October 14, 1990, then the installments to be paid under the agreement would be recalculated to accelerate full payment "to the end that the last installment or note shall be due no later than October 14, 1990." Consistent with their concern about renewal of the lease, the buyers, Messrs. Chudesama and Kapoor, stipulated that all payments under the June Agreement were to be received as payment for the sellers' stock in State News until the $ 2.2 million purchase price for the stock had been paid in full. In effect, none of the payments under the covenant not to compete were to be received until after the time the lease was renewed. We do not find a provision to that effect in the June Agreement, but the letter from sellers' attorney, Mr. Katzman, dated July 8, 1983, quoted above, and his testimony at trial make it clear that was the intention of the parties to the agreement, and respondent tacitly concedes that the June Agreement so provides. In view of the fact that *81 the parties to the June Agreement had competing interests and negotiated the contract at arm's length, we see no reason to disregard the terms of their bargain. E.g., O'Dell & Co. v. Commissioner, 61 T.C. 461 (1974); Lutz v. Commissioner, 45 T.C. 615, 633-635 (1966), revd. on other grounds 396 F.2d 412 (9th Cir. 1968). Respondent's assertion that the parties had no business purpose for delaying payment under the covenant is not sufficient in this case to justify disregarding the bargain that they struck. Moreover, respondent cannot have it both ways. He cannot base one adjustment on the terms of the contract, i.e., increasing petitioner's income by the amount called for under the June Agreement, and base another adjustment on the theory that the terms of the contract were not binding on the parties. Therefore, we accept petitioners' contention that all payments received under the June Agreement during 1983 are allocable to the sale of Mr. Weissbart's stock in State News. We hold that all of the income from the June sale of State News stock shall be treated as income from the sale of a capital asset. 4. Additions to *82 Tax for Negligence
Section 6653(a)(1) provides an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is due to negligence or intentional disregard of respondent's rules or regulations. Section 6653(a)(2) provides an addition to tax equal to 50 percent of the interest payable under section 6601 with respect to any portion of the underpayment which is attributable to negligence or intentional disregard of rules or regulations. For purposes of this statute, negligence is "a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent determined additions to tax for negligence under section 6653(a)(1) and (2) for each of the 3 years in issue. Petitioners have the burden of proving that the additions are not appropriate. Rule 142(a), Tax Court Rules of Practice and Procedure; Johnson v. Commissioner, 74 T.C. 89, 96 (1980), affd. 673 F.2d 262 (9th Cir. 1982). Petitioners recite the fact that Mr. Weissbart retained an accountant, Mr. Hermele, to maintain a full set of books for *83 State News and to prepare Federal income tax returns both for State News and Mr. and Mrs. Weissbart for each of the years in issue. They contend that Mr. Weissbart cooperated with Mr. Hermele and followed his recommendations and that the Weissbarts' lifestyle was not inconsistent with the income which they reported during the years in issue. Accordingly, petitioners contend that the Weissbarts were not negligent and are not subject to additions to tax for negligence under section 6653(a)(1) and (2). We disagree. We do not accept petitioners' assertion that Mr. Weissbart was not negligent in his handling of the affairs of State News or in filing the subject returns on behalf of himself and Mrs. Weissbart. As discussed above, prior to the summer of 1982, Mr. Weissbart caused proceeds from the business of State News to be distributed to him, or on his behalf. After Messrs. Fontana and Tikijian came on board during the summer of 1982, Mr. Weissbart permitted them to divert proceeds from the business of State News. Mr. Hermele's testimony suggests that Mr. Weissbart failed to provide him with records or other information which he requested and Mr. Hermele stated, "many times he *84 wouldn't have what I would ask for and I would have to do the best I could." For example, Mr. Weissbart did not give Mr. Hermele a copy of the January contract. We note that petitioners do not argue that the Weissbarts were not negligent because they relied on good faith on the advice of an accountant. See, e.g., Pessin v. Commissioner, 59 T.C. 473, 489 (1972); Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968). However, even if they had made that argument, we would reject it. They have not established that the Weissbarts supplied Mr. Hermele with correct and complete information, a prerequisite for claiming reliance upon the advice of an accountant. E.g., Pessin v. Commissioner, supra at 489; Enoch v. Commissioner, 57 T.C. 781, 803 (1972). Petitioners present no further argument or evidence to show that they were not negligent. Therefore, we sustain respondent's determination of additions to tax under section 6653(a)(1) and (2) with respect to each of the adjustments sustained herein. 5. Addition to Tax for Substantial Understatement
Section 6661 provides an addition to tax equal *85 to 25 percent of the amount of any underpayment which is attributable to a substantial understatement of income tax for any taxable year. Sec. 6661(a); see Pallottini v. Commissioner, 90 T.C. 498 (1988). For this purpose, an "understatement" is the excess of the amount of tax required to be shown on the return for the taxable year, over the amount of tax which is shown on the return. There is a "substantial understatement" if the amount of the understatement for the taxable year exceeds the greater of 10 percent of the tax required to shown on the return for that year or $ 5,000. In this case, it is clear that there is a substantial understatement of petitioners' Federal income tax for 1981, 1982, and 1983. Accordingly, respondent determined that petitioners are liable for additions to tax under section 6661. Petitioners take issue with the addition under section 6661. They state that "there has been no substantial understatement of liability." Unfortunately, they do not explain why they perceive this to be true and we see no basis for their statement. Accordingly, we sustain respondent's determination that petitioners are liable for the section 6661 additions *86 to tax at the 25 percent rate. 6. Whether Mrs. Weissbart Qualifies for Relief from Joint Liability Pursuant to Section 6013(e)
Petitioners claim that Mrs. Weissbart is relieved of joint and several liability for the tax deficiencies and additions in issue, pursuant to section 6013(e), on the ground that she qualifies as a so-called innocent spouse. There are four conditions for eligibility under section 6013(e)(1). [1] This case turns on whether the requirements of two of those conditions, the ones set forth in subparagraphs (C) and (D) of section 6013(e)(1), have been met. Petitioner bears the burden of proof as to both of these conditions. Bokum v. Commissioner, 94 T.C. 126, 138 (1990); Sonnenborn v. Commissioner, 57 T.C. 373 (1971). *87 Before discussing the requirements of subparagraphs (C) and (D) of section 6013(e)(1), we note that respondent does not concede that section 6013(e)(1)(B) has been met with respect to unreported interest income of $ 282 which the Weissbarts earned in 1982. The Weissbarts earned this interest from three bank accounts, the largest of which was in Mrs. Weissbart's name. Respondent does not concede that this interest income was "attributable to [a] grossly erroneous item" of Mr. Weissbart, within the meaning of section 6013(e)(1)(B), and petitioners presented nothing to prove that fact. Therefore, we hold that Mrs. Weissbart is not relieved of liability for tax with respect to the $ 282 of unreported interest income. Under section 6013(e)(1)(C), petitioners must prove that, in signing the return, Mrs. Weissbart did not know, and had no reason to know, that there was a substantial understatement of tax attributable to the grossly erroneous items of Mr. Weissbart. That is, petitioners must prove that she was unaware of the circumstances which gave rise to the errors on the return. Bokum v. Commissioner, supra at 145-146; Purcell v. Commissioner, 86 T.C. 228, 238 (1986), *88 affd. 826 F.2d 470 (6th Cir. 1987). In making this determination, the standard is whether a reasonable person in the same circumstances as the taxpayer at the time of the signing of the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted. Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Bokum v. Commissioner, supra at 148; Purcell v. Commissioner, supra at 228. Mrs. Weissbart asserts that she did not know, at the time she signed each of the returns in issue, of the circumstances leading to errors in each of the subject returns. Her testimony and the testimony of various witnesses establish that Mr. Weissbart told his wife nothing about his business affairs or personal finances. Mrs. Weissbart credibly testified that during more than 40 years of marriage, her inquiries about her husband's finances caused unpleasant scenes with her husband. She said that her only options were to accept her husband's refusal to talk or to get a divorce. Her testimony was corroborated by the *89 testimony of Mr. Yakov Talbaladsky, the bookkeeper of State News, Mr. Hermele, the Weissbarts' accountant, and Mr. Katzman, the Weissbarts' attorney. Respondent does not contest these assertions. He argues that Mrs. Weissbart, nevertheless, had reason to know of her husband's omissions from income by reason of his refusal to discuss the couple's financial affairs, and because the income reported on the subject returns was modest in relation to the couple's expenditures, especially his gambling. We agree with petitioners that Mrs. Weissbart should not necessarily have been put on notice of omissions from the income reported on the joint returns which she filed for 1981, 1982, and 1983 by reason of her husband's refusal to discuss the couple's financial affairs at or near the time those returns were filed. Mr. Weissbart's refusal to discuss his financial affairs with Mrs. Weissbart was a longstanding position which Mr. Weissbart maintained throughout their married life. It was not a change which came over him and which should have put Mrs. Weissbart on notice of a problem. We also reject respondent's argument that Mrs. Weissbart should reasonably have been put on notice of omitted *90 income by the disparity between the couple's expenditures during the year and the income reported on the return for each such year. We find that Mrs. Weissbart did not know the extent of her husband's gambling. In addition, Mr. Weissbart had been a chronic gambler before the years at issue so that his gambling excursions during those years were not new or unusual and it is understandable that they did not arouse Mrs. Weissbart's suspicions. See, e.g., Streit v. Commissioner, T.C. Memo. 1989-265. Moreover, we do not believe that the expenditures which Mr. Weissbart made to maintain the couple's home in Englewood Cliffs, New Jersey, and the three properties in Florida were sufficient to put Mrs. Weissbart on notice of omissions from the income reported on the returns for the subject years. This is particularly true in light of the fact that the aggregate indebtedness on three of the properties, the ones sold near the time of Mr. Weissbart's death, had increased by approximately $ 157,215.88 during the time the Weissbarts owned those properties. This is further discussed below. Accordingly, we hold that in signing each of the subject returns, Mrs. Weissbart *91 did not know and had no reason to know that there was a substantial understatement of the tax required to be shown on the return. Thus, the requirements of section 6013(e)(1)(C) are satisfied in the case of each of the returns at issue. Under section 6013(e)(1)(D), the second of the two conditions for innocent spouse treatment which is at issue in this case, petitioners must prove that it would be inequitable to hold Mrs. Weissbart liable for the tax deficiencies in question. The term "inequitable" is defined in section 1.6013-5(b), Income Tax Regs., as follows: Whether it is inequitable to hold a person liable for the deficiency in tax * * * is to be determined on the basis of all the facts and circumstances. In making such a determination a factor to be considered is whether the person seeking relief significantly benefitted, directly or indirectly, from the items omitted from gross income. However, normal support is not a significant "benefit" for purposes of this determination. Evidence of direct or indirect benefit may consist of transfers of property, including transfers which may be received several years after the year in which the omitted item of income should *92 have been included in gross income. Thus, for example, if a person seeking relief receives from his spouse an inheritance of property or life insurance proceeds which are traceable to items omitted from gross income by his spouse, that person will be considered to have benefitted from those items. Other factors which may also be taken into account, if the situation warrants, include the fact that the person seeking relief has been deserted by his spouse or the fact that he has been divorced or separated from such spouse.
Respondent contends that Mrs. Weissbart, the sole beneficiary of her husband's estate, has failed to show that the estate does not include property which is traceable to items omitted from gross income. Specifically, respondent notes that Mrs. Weissbart produced no list of the assets in Mr. Weissbart's estate. He argues that the three Florida properties which Mr. Weissbart owned at the time he died and his share of the proceeds from the sale of the couple's house in Englewood Cliffs "must be attributable to the omitted income in view of petitioners' high expenses and low reported income." Petitioners explain that no list of estate assets was produced because *93 no such list was ever compiled. The estate was not required to go through a Florida probate proceeding nor was it required to file a Federal estate tax return. At trial, Mrs. Weissbart testified that the assets in her husband's estate consisted of: Mr. Weissbart's share of the proceeds which they had realized from the sale of their home in Englewood Cliffs, New Jersey, $ 115,692.50; the Florida condominium which she sold on October 20, 1987, after he died and from which she realized a net payment of $ 14,271.58; the single family house located at 6921 N.W. 44th Court which she and her son sold on January 20, 1988, and from which they realized a net payment of $ 29,080.87; and, finally, the single family house located at 6901 N.W. 44th Court. Furthermore, as mentioned above, we note that the three properties which were sold near the time of Mr. Weissbart's death were subject to indebtedness in the aggregate amount of $ 404,559.24, that is, $ 157,215.88 more than the indebtedness which Mr. Weissbart incurred when he purchased the properties. Set out below is a schedule which shows the mortgage to which each of the properties was subject at the time *94 it was purchased and the indebtedness which was assumed by the buyer when each of those properties was sold. Mortgage at Mortgage at Time of Purchase
Time of Sale
Florida Condominium
$ 24,700.00 $ 34,932.61 6921 N.W. 44t h Court
123,643.36
118,397.15
Englewood Cliffs, NJ
100,000.00
252,229.48
$ 248,343.36
$ 405,559.24
Petitioners have proven that Mrs. Weissbart had been married to her husband for approximately 42 years at the time he died. During that time, he gave her a weekly allowance which, during the years at issue, was approximately $ 200 per week, and he provided her with the necessities of life. They have proven that Mr. Weissbart was a chronic gambler and kept secret the amount of his gambling. He also kept his financial affairs secret from Mrs. Weissbart. Petitioners have also proven that the three properties which he owned at the time of his death were heavily mortgaged and that the mortgages on the properties had increased during the period of time which he owned. Under the circumstances of this case, we find that it would be inequitable to hold Mrs. Weissbart liable for the tax deficiency for each of the subject years. *95 Thus, petitioners have carried their burden of proving the four conditions required by section 6013(e)(1), except as mentioned for the application of section 6013(e)(1)(B) to $ 282 of interest income, and we hold that Mrs. Weissbart is relieved of liability for tax for each of the taxable years 1981, 1982, and 1983, to the extent such liability is attributable to the substantial understatement for that year. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Sec. 6013(e) was amended by sec. 424, Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 408, 801. This amendment applied retroactively to all taxable years to which the Internal Revenue Codes of 1954 and 1939 apply. Sec. 424(c), Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 408, 803. Thus, the amended version of section 6013(e)↩ applies to the Weissbarts' taxable years 1981, 1982, and 1983.